IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| COREL SOFTWARE, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>    Defendant. | MEMORANDUM DECISION AND ORDER RESOLVING CLAIM CONSTRUCTION DISPUTES AND GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT<br><br>FILED UNDER SEAL<br><br>Case No. 2:15-cv-00528-JNP-JCB<br><br>District Judge Jill N. Parrish |

Plaintiff Corel Software, LLC sued defendant Microsoft Corporation for patent infringement. Before the court are a number of disputes regarding the proper construction of terms found in the patents at issue in this action. Additionally, Microsoft has moved for summary judgment. ECF No. 318. In this order, the court resolves the claim construction disputes and GRANTS IN PART and DENIES IN PART Microsoft's motion for summary judgment.

## BACKGROUND

Two patents are currently at issue in this litigation. The first patent was issued by the United States Patent and Trademark Office (PTO) in 2004 as U.S. Patent No. 6,731,309 (the '309 patent). The '309 patent describes a method for previewing changes to a word processing document while moving guidelines or margins. This method, known as "real time preview," allows the user to click on a guideline or margin and drag it to a new position. As the user drags the guideline or margin to a new location, any text or images linked with the guideline or margin adjust to the new location in real time, allowing the user to preview how changes to the guideline or margin will affect the

document. When the user is satisfied with a new location, he or she releases the mouse button and the new guideline or margin locks into place.

The PTO issued the second patent, U.S. Patent No. 7,827,483 (the '483 patent), to Corel in 2010. The '483 patent is a continuation of the '309 patent. It describes a method for previewing font changes in a word processing document. The '483 patent discloses a process whereby the user selects text in a document and then opens a font drop-down menu. When the user hovers the cursor over a font selection in the drop-down menu for a predetermined period of time, the selected font is applied to text in the document. If the user moves the cursor to a second font selection and hovers for a period of time, the new font is applied to the document. The user can repeat this process to preview various font selections until he or she is satisfied with a selection. The user can then click on the desired font selection to confirm the change.

In 2015, Corel sued Microsoft for infringing the '483 and the '309 patents. Corel alleges that a number of Microsoft's products infringe Claims 1, 2, 3, 4, 6, 7, 11, and 14 of the '483 patent and Claims 2 and 3 of the '309 patent. Microsoft moves for partial summary judgment on these claims. First, it argues that some of its accused products do not infringe the '483 patent because they do not contain one of the limitations common to all of the claims of this patent. Microsoft also argues that some of the features found in the accused products do not infringe the '483 patent as a matter of law. Finally, Microsoft asserts that it cannot be liable for infringing the '309 patent because it is invalid in light of prior art.

## ANALYSIS

The parties dispute the proper construction of several of the terms found in the '483 and the '309 patents. The court first resolves these construction disputes. The court then turns to Microsoft's motion for summary judgment. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,

2

239 F.3d 1343, 1351 (Fed. Cir. 2001) ("A claim must be construed before determining its validity just as it is first construed before deciding infringement." (citation omitted)).

## I.      CLAIM CONSTRUCTION

### A.      Legal Standard

The proper construction of words or phrases found in a patent claim is a question of law for the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 387 (1996). "[T]he words of a claim 'are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) (citation omitted).

In determining the ordinary and customary meaning of a term, courts first look to intrinsic evidence, which includes "the patent claims and specifications, along with the patent's prosecution history." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015); *accord Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 574 U.S. at 331. Extrinsic evidence includes "expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317.

### B.      The '483 Patent

#### 1)      "updating the display of the active document"

The parties dispute the proper construction of the following phrase found in the '483 patent: "updating the display of the active document in the document display windows to show the impact of the inserted font command code on the display of the text of the active document." This language describes a method of displaying changes to the font of selected text in a document when the user

3

hovers the cursor over a font selection in a drop-down menu. Corel argues that no construction of this phrase is necessary because it is not ambiguous. Microsoft, however, argues that this term should be interpreted to read: "changing the screen to show the identified font in the user's active document, not in a transient representation of the user's document." Notably, Microsoft does not contend that a person of ordinary skill in the art of creating word processing software would understand the claim language differently than a jury or judge not skilled in the art. Instead, it asserts that its proposed construction is required to account for disclaimers that Corel made during the prosecution of the '483 patent.

### a)  Legal Standard for Prosecution History Disclaimer

"The prosecution history . . . consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "The purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'" *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (citation omitted) (cited with approval in *Phillips*, 415 F.3d at 1317). The Federal Circuit has "declined to apply the doctrine of prosecution disclaimer where the alleged disavowal of claim scope is ambiguous." *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1325 (Fed. Cir. 2015) (citation omitted); *accord SAS Inst., Inc. v. ComplementSoft, LLC.*, 825 F.3d 1341, 1349 (Fed. Cir. 2016) ("[F]or prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable." (alteration in original) (citation omitted)). "But where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *TomTom*, 790 F.3d at 1325 (citation omitted).

"'Although statements in a file history may of course be used to explain and potentially limit the meaning of claim limitations,' they 'cannot be used to add an entirely new limitation to the claim.'" *Regents of Univ. of Minnesota v. AGA Med. Corp.*, 717 F.3d 929, 945 (Fed. Cir. 2013) (citation omitted); *accord Chimie*, 402 F.3d at 1379 ("Although the prosecution history can and should be used to understand the language used in the claims, it cannot enlarge, diminish, or vary the limitations in the claims." (cleaned up)). "[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317.

b) Prosecution History of the '483 Patent

In 1997, the PTO issued U.S. Patent No. 5,694,610 to Microsoft. Throughout this litigation, this patent has been referred to as "Habib," after the first named inventor. Habib described a method for previewing font changes in Microsoft Word. Under Habib, the user selects text in a document and opens a font dialog box, which contains a small preview window that displays a two- or three-word snippet from the selected text. The user may make changes to the font style, size, or color of the sample text contained in the preview window by selecting among various options presented in the dialog box. The user can then close the dialog box and apply the modifications to the selected text in the active document by clicking on the "OK" button. Alternatively, the user can reject the changes by clicking on the "Cancel" button.

In 1998, Corel submitted a patent application for its font preview invention.[1] In August 2003, the patent examiner rejected the claims associated with this invention, reasoning that they were obvious in light of the disclosures made in the Habib patent. In January 2004, Corel responded to the patent examiner's decision by amending the font preview claims. Corel also submitted a commentary on the amendments, asserting: "It will be clear that these claim additions are not being made to distinguish from the prior art references or address some other question of patentability, but merely for clarification." Corel's remarks on its amendments contains three annotations that are relevant to Microsoft's disclaimer argument.

- Commenting on the removal of the phrase "real time preview" from the preamble of each claim, Corel argued: "The invention does not provide a 'preview' in the traditional sense. Rather than providing a transient representation of how a command might impact a document, the method of the invention actually executes the identified command. The invention can be used instead of a preview system, because it operates quickly enough (i.e. in real time), that the user can make and undo a multiplicity of changes just as quickly and easily as previews were done in the past."

- Commenting on its amendment of the phrase "code corresponding to the identified command" to "identified command," Corel argued: "Clearly, software code which effects a transient representation of a command's execution in a small preview window, is different code than the code which will execute when the command itself is executed. With the invention, when a command is identified, the command is executed – not preview code or any other code – but the complete and original software code that defines the identified command, is executed."

---

[1] Corel's initial patent application contained claims covering both its guideline and margin preview invention and its font preview invention. In 2003, Corel elected to cancel the font preview claims from the original application and resubmit them in a separate patent application. The PTO issued the '309 Patent for the guideline and margin preview invention in 2004. It then issued the '483 patent for the font preview invention in 2010. Because the prosecution of the '483 patent was a continuation of the original patent application, the court considers the prosecution history of both patents when construing the language of the '483 patent. *See Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1373 (Fed. Cir. 2003).

- Further commenting on the "identified command" amendment, Corel also asserted: "In the case of Habib et al, the actual command is not being executed as part of their preview system – rather, software code is being executed which effects a transient representation of a command's execution in a small preview window. Because Habib et al. do not describe these elements of the amended claim 41, the Applicants submit that Habib et al. do not anticipate new claim 41."

Over the ensuing years, Corel continued to amend the proposed claim language for its font preview invention. In 2010, over six years after Corel submitted the above-quoted remarks, the PTO issued the '483 patent to Corel for the font preview invention. The patent contains the following limitation: "updating the display of the active document in the document display windows to show the impact of the inserted font command code on the display of the text of the active document, without confirmation being received from the user."

c)   Alleged Prosecution Disclaimer

Microsoft argues that Corel's remarks during the prosecution of the '483 patent constitute clear disclaimers of claim scope. It contends that by using the phrase "transient representation of how a command might impact a document" or "transient representation of a command's execution" when arguing that its front preview invention was distinguishable from the preview window method described in Habib, Corel specifically disclaimed previews to font modifications in a transient representation of the document. Microsoft asserts that this disclaimer requires the court to construe the '483 patent language to include the qualifying clause, "not in a transient representation of the user's document," to clarify where the font preview commands are displayed.[2]

_____

[2] The full text of Microsoft's proposed construction is "changing the screen to show the identified font in the user's active document, not in a transient representation of the user's document." The first clause of this proposed construction paraphrases the following language from the '483 patent: "updating the display of the active document in the document display windows to show the impact

The court rejects Microsoft's proposed construction. "Claim terms are entitled to a 'heavy presumption' that they carry their ordinary and customary meaning to those skilled in the art in light of the claim term's usage in the patent specification." *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1371 (Fed. Cir. 2007). Because of this presumption, the bar for showing prosecution disclaimer is high. The disavowal of claim scope must be "both clear and unmistakable." *SAS Inst.*, 825 F.3d at 1349. Prosecution statements that are "too vague or ambiguous" do not "qualify as a disavowal of claim scope." *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003).

The prosecution statements made by Corel do not constitute a clear and unmistakable surrender of claim scope. Corel prefaced its remarks to the examiner by stating that the amendments were "not being made to distinguish from the prior art references [e.g., Habib] or address some other question of patentability, but merely for clarification." In other words, the intent of the amendments was not to limit the scope of the claim language but to clarify that the claims were distinguishable from the prior art. The statements highlighted by Microsoft are in line with Corel's expressed intent not to surrender claim scope. At the time of the 2004 amendments, the claim language included the limitation of "inserting corresponding code into said active document." In the context of this claim language, Corel's remarks are best understood as arguments that the claim language, *as written*, was distinguishable from Habib because Corel's invention modified the active document rather than a snippet of sample text in a separate preview window. In other words, Corel did not express a clear intent to surrender a plausible interpretation of the

---

of the inserted font command code on the display of the text of the active document." But Microsoft does not explain why the court should modify the patent's language. Absent any explanation as to why the first clause of Microsoft's proposed construction is required, the court rejects it.

claim language. *See TomTom*, 790 F.3d at 1325 ("[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." (citation omitted)). Instead, Corel argued that its invention, as described in the proposed claim language, was novel and not anticipated by Habib. *See Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 833 (Fed. Cir. 2003) (holding that a statement made during patent prosecution was not "a clear and unambiguous disavowal of claim scope" because "[w]hen th[e] remark is viewed in context, it is apparent that the applicants were distinguishing their invention from . . . prior art"). Absent a clear and unmistakable disavowal of claim scope that was not already conveyed by the plain language of the claims, the prosecution history of the '483 patent cannot be used to "enlarge, diminish, or vary the limitations in the claims." *See Chimie*, 402 F.3d at 1379.[3]

Because Microsoft has not shown that Corel made a clear prosecution disclaimer, the court rejects Microsoft's proposed construction and finds that no interpretation of the "updating the display of the active document" language is required.

   2) "font"

Corel and Microsoft also dispute the meaning of the word "font." Corel argues that this term should be given its plain and ordinary meaning and that no construction is necessary. Microsoft asserts that this term should be construed to mean "font face, font size, or font color" for two reasons.

---

[3] Even if the court were to accept Microsoft's prosecution disclaimer argument, the construction that it proposes is overly broad and misleading. The proposed phrase, "not in a transient representation of the user's document," implies a temporary representation of the document as a whole, rather than a few words displayed in a small preview window as disclosed in Habib.

a)  Specification Language

First, Microsoft contends that statements made in the specification of the '483 patent require the court to adopt its proposed construction. "The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996). "[A] patentee is free to be his own lexicographer" by defining terms in the specification. *Id.* at 980. But "any special definition given to a word must be clearly defined in the specification." *Id.* Moreover, "[t]he written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims." *Id.*

Microsoft points to two statements found in the specification. In discussing the preferred embodiment, the specification states: "When selecting a font face, for example, it is probably desirable to leave the menu open . . . ." In discussing how the preferred embodiment of the invention dealt with matching codes, the specification of the patent also includes the following language:

> Different font sizes, for example, would yield matching codes. If a selected block of text has a font size of 10, and the identified command is to change the font size of the same block to text of font size 12, then the routine will find the font size 10 matching codes, remove them at step 48 and insert the code for the font size 12 into the document at step 50.

Claim 4 of the '483 patent also specifically describes previewing font color. Microsoft argues that because the specification only references font face and size, while Claim 4 mentions only font color, the term "font" must be limited to mean font face, font size, or font color.

The court disagrees. Taken in context, the references to font face and font size in the specification were merely illustrations used to explain the preferred embodiment of the invention.

Indeed, each reference includes the qualifier, "for example." These references do not state or imply that font face or font size are the only font attributes included within the term "font" in the claims. "[A]lthough the specification often describes very specific embodiments of the invention, [the Federal Circuit has] repeatedly warned against confining the claims to those embodiments." *Phillips*, 415 F.3d at 1323; *accord Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The claims, not specification embodiments, define the scope of patent protection. The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims."). Thus, individual illustrations referenced in the specification may not limit the construction of terms found in the claims. And Microsoft has not provided any authority or argument for the proposition that an express limitation of "font color" found in Claim 4 of the patent should be imported to other claims that do not so limit the term "font."

### b) Prosecution Disclaimer

Second, Microsoft argues that the doctrine of prosecution disclaimer supports its proposed interpretation. Microsoft notes that in 2008, Corel narrowed the claim language to previewing "fonts" rather than previewing "commands." But Microsoft provides no reasoning or authority for the proposition that this amendment requires the court to further limit the definition of the term "font." Microsoft also points to the fact that Corel filed an application that became U.S. Patent No. 8,700,996 (the '996 patent) in 2013—three years after the PTO issued the '483 patent. It argues that because the '996 patent covers previews of other commands such as line spacing, text justification, text wrapping, and table styles, the court should limit the definition of "font" in the '483 patent to exclude subject areas covered by the '996 patent. Once again, however, Microsoft fails to cite any authority in support of its contention that the prosecution of a subsequent patent

11

retroactively limits the meaning of terms found in a prior patent. Indeed, the Federal Circuit has refused to apply the prosecution history of a related patent where "[t]he patentee's whole point in filing the application that resulted in the [related] patent was to secure broader claims." *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1306 (Fed. Cir. 2001). Microsoft's prosecution disclaimer arguments are without merit.

Accordingly, the court rejects Microsoft's proposed construction of "font" and accepts Corel's proposal that the term be given its plain and ordinary meaning.[4]

          3)      Order of Method Steps

The parties agree that some of the steps recited in Claim 1 of the '483 patent must be performed in the recited order. But they dispute whether other steps must be performed in order. "Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one. However, such a result can ensue when the method steps implicitly require that they be performed in the order written." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003) (citation omitted). In determining whether an order is implicitly required, a court first looks "to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written." *Id.*

Microsoft first argues that the "storing an active document in a memory medium" step must come before the step of "displaying at least part of the active document in the document display

---

[4] This construction, of course, begs the question of what the plain and ordinary meaning of "font" would be to a person of ordinary skill in the art at the time the invention was made. Corel argues in the alternative that, "to the extent a construction will aid the jury," this term means "a set of attributes for text characters." At this juncture, Corel's proposed alternate construction is premature. If Corel or Microsoft believes that the jury should receive a clarifying instruction for this term, it may propose the instruction at the appropriate time.

window." It contends that Corel's expert conceded that this sequential ordering was required. *See id.* at 1371 (When determining whether ordering of steps is required "expert testimony serves the permissible purposes of aiding [a court's] understanding of the technology and in helping [the court to] view the patent through the eyes of the skilled artisan."). But the deposition testimony cited by Microsoft is not conclusive. When asked whether he agreed that "to display a document, it needs to be in memory first," Corel's expert responded: "I think that's probably right, generally speaking." This hedging response does not unequivocally establish that the storing step must always come before the displaying step. Accordingly, Microsoft has not shown that logic requires that these steps be performed in written order.

Microsoft also argues that the "displaying at least part of the active document in the document display window" step must be performed before the step of "updating the display of the active document in the display window." The court agrees. As a matter of grammar and logic, the active document must necessarily be displayed before the display can be updated.

C.    *The '309 Patent*

The parties initially disputed the meaning of three of the terms used in the '309 patent: 1) "guidelines," 2) "margins," and 3) "document guidelines or margins." But at the claim construction hearing, they informed the court that they had agreed to constructions for "guidelines" and "margins." Under this agreement, the word "guidelines" means "non-printing lines that aid in aligning text and other objects." The word "margins" means "non-printing formatting features that allow a user to set a boundary at a vertical or horizontal edge of a document page." The only dispute left to resolve is what the modifier "document" contributes to the meaning of "guidelines" and "margins."

13

Corel asserts that no construction is required for "document guidelines or margins." But it simultaneously requests that the court interpret this phrase to mean guidelines or margins that apply to an entire document page and not to a feature within a document, such as a text box. Microsoft, on the other hand, contends that this phrase should be interpreted to mean "guidelines or margins within a document." Because the parties dispute the meaning of "document guidelines or margins," the court must resolve this dispute. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (holding that construction is required "when the meaning or scope of technical terms and words of art is unclear and in dispute and requires resolution in order to determine obviousness").

Corel argues that the word "document" modifies the phrase "guidelines or margins" to mean "guidelines or margins for a document." It further asserts that under this reading of the phrase, a document guideline or margin must set a boundary for an entire document page. But, as a matter of grammar, this language does not require such a narrow construction. The word "document" is an attributive noun that modifies "guidelines or margins." Although the meaning of an attributive noun phrase can sometimes be arrived at by reversing the order of the words and interposing the preposition "for" (the meaning of "dog food," for example, is food for dogs), that is not always the case. The term "chicken soup" does not mean soup for chickens, nor is a "steel bridge" a bridge for steel. An attributive noun can also describe where the modified noun is located or may occur, such as "country house" or "jungle warfare." Thus, there is no inherent fixed meaning for "document guidelines" or "document margins" that would support Corel's

14

interpretation over Microsoft's reading.[5] The most that can be said from the language of the phrase "document guidelines or margins" is that a guideline or margin must relate or pertain in some way to a document.

The specification of the '309 patent resolves the ambiguity inherent in this phrase in favor of Microsoft's interpretation. The specification describes an embodiment of the invention that permits the user to "adjust the tab guidelines in a table." This function is displayed in Corel WordPerfect 9, which embodies the '309 patent. WordPerfect 9 permits the user to create a table with a number of cells, each containing text, arranged horizontally on the page. The user is able to display guidelines associated with the border of each individual cell and adjust the guideline to either enlarge or shrink the cell.[6] The text located in the cell adjusts as the cell border guidelines are moved. But other content on the document page located above or below the cell remains unaffected by these adjustments. Thus, a preferred embodiment of the invention referenced in the specification covers the use of guidelines within the document rather than guidelines that affect the entire document page.[7] Indeed, there is little difference between a text box, which Corel argues to be excluded from the definition of "document guidelines and margins," and table cells, which are referred to as a preferred embodiment in the specification. Because Corel's proposed

---

[5] Moreover, Corel's assertion that "document guidelines and margins" must mean guidelines and margins for a document is at odds with its contention that a guideline or margin must apply to an entire document page rather than to the entire document. A document page is only a part of the larger document. Corel does not explain why its definition requires a guideline or margin to modify one subset of a document, like a document page, while excluding a guideline that modifies another part of a document, like a text box.

[6] A contemporaneous user manual for WordPerfect 8 confirms that "WordPerfect can display dotted gridlines and guidelines around each cell." MASTERING WORDPERFECT 8 (2d ed. 1997).

[7] Corel also conceded that WordPerfect permits the user to adjust guidelines for individual sentences and paragraphs, rather than for an entire document page.

construction would exclude this preferred embodiment, the court rejects it. *See SanDisk Corp. v. Memorex Prod., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005) ("A claim construction that excludes a preferred embodiment . . . 'is rarely, if ever, correct.'" (citation omitted)).

Corel argues that the court must accept its proposed interpretation of the phrase "document guidelines or margins" in order to avoid rendering the term "document" meaningless. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."). But Microsoft's interpretation does not read the word "document" out of the claim language. Its proposed construction gives meaning to "document" by locating the guideline or margin in the document rather than in, for example, the display window.[8]

The court, therefore, adopts Microsoft's interpretation of the phrase "document guidelines or margins" because it conforms with both the plain language of the phrase and the intrinsic evidence presented in the specification. The court construes this phrase to mean guidelines or margins within a document.

## II. MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this

---

[8] Corel acknowledged in its slide presentation at oral argument that guidelines could be located in a display window rather than in a document.

burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment on a claim is required if the party that bears the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

### B. The '483 Patent

Corel alleges that a number of Microsoft's products infringe the '483 patent. Microsoft argues that it is entitled to summary judgment on two broad categories of Corel's infringement claims. First, Microsoft argues that Microsoft Word (versions 2007-2019), Microsoft Outlook (versions 2007-2019), Microsoft PowerPoint (versions 2007-2019), Microsoft Visio (versions 2013-2019), and Microsoft Excel (versions 2019 and Excel Online) do not infringe the '483 patent as a matter of law. Collectively, these products are referred to as the "Microsoft MSJ Products." Second, Microsoft argues that a list of seven features utilized by its products do not infringe the '483 patent. Microsoft labels this list of features as the "Microsoft MSJ Features."

The court first addresses Microsoft's argument that the Microsoft MSJ Products do not infringe the '483 patent. The court then turns to its contention the Microsoft MSJ Features do not infringe.

### 1) Microsoft MSJ Products

#### a) Literal Infringement

"Literal infringement requires the patentee to prove that the accused device contains each limitation of the asserted claim(s). If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Rsch. Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000) (citation omitted). Microsoft argues that there is no dispute of material fact

17

that would preclude summary judgment on Corel's literal infringement claim against the Microsoft MSJ Products because the products do not contain the following limitation of the '483 patent: "updating the display of the active document in the document display windows to show the impact of the inserted font command code on the display of the text of the active document."

The "scratch document" method of previewing font command codes, employed by each of the Microsoft MSJ Products, is central to Microsoft's argument. Under this method, when the user opens a font selection drop-down menu and hovers the cursor over a font selection, a pixel-for-pixel clone of the user's document—the scratch document—is generated and overlaid on top of the original document.[9] Because this scratch document is an exact copy of the original document, the user does not perceive that a clone is displayed on the screen, rather than the original document. The font selection is displayed in the scratch document that appears on the user's screen. The original document remains unchanged. The user can repeat this process to review the display of other font options in the scratch document. If the user selects a font option by clicking on it, the scratch document is removed from display on the user's screen and saved in memory in case the scratch document is needed in the future. The command code for the font selection is simultaneously entered into the original document and it is returned to display on the screen. This process of switching back to the original document is so rapid that the user is unaware of the transition. In fact, the entire process is so seamless that it creates the illusion that the user is previewing the font selections in the original document. Microsoft contends that the scratch document method of previewing font commands is superior to performing and undoing font

---

[9] In some of the Microsoft MSJ Products, a clone of the entire document is generated and displayed. In some circumstances in some of the Microsoft MSJ Products, a partial copy of the whole document may be created and displayed.

commands in the active document because it reduces the risk of corrupting the original document while previewing font options.

Microsoft argues that its scratch document method does not literally infringe the "updating the display of the active document in the document display windows" limitation of the '483 patent. The court agrees. Under the scratch document method, the "active document" is the original document, which can be endlessly modified by adding, removing, or changing text or images. The user's unrestricted ability to manipulate a document until it reaches a form that the user is satisfied with (or is good enough, as the case may be) marks it as the "active" document. The scratch document, on the other hand, is much more limited. It temporarily displays changes to font of selected text until the user makes the desired selection. Moreover, the original document is the active document because it is the version retained by the user for future use. While the scratch document is saved in memory in case a particular scratch document font display is needed in the future, it is not retained and displayed as the core version of the document to be modified, printed, saved, emailed as an attachment, or otherwise used by the consumer.

The structure of the '483 patent confirms this interpretation. The elements of Claim 1 include: 1) "storing an active document," 2) "displaying at least part of the active document," 3) "identifying a font by hovering the cursor for a predetermined period of time over the font displayed in a menu or toolbar option . . . associated with a respective font command codes that can be applied to the active document," 4) "inserting the font command code corresponding to the identified font into the memory medium storing the active document," and 5) "updating the display of the active document in the document display windows to show the impact of the inserted font command code." These elements show that the active document is the same core document that is stored and displayed before a font is selected and previewed by updating the display of the active

document in the display window. Under the '483 patent, the same active document is used for the entire process. But the scratch document method creates a new temporary document to display changes to font while leaving the original active document unchanged. Because the scratch document method does not update the display of the active document to show the impact of font selections, the Microsoft MSJ Products do not literally infringe the '483 patent.

Corel raises a number of arguments against summary judgment on literal infringement of the Microsoft MSJ Products. First, it argues that there are unresolved disputes of material fact as to whether there are links in the underlying data structure between the scratch document and the active document. But any disputes are not material because the limitations of the '483 patent do not include or even reference the data structure of Corel's invention. It is a method patent describing a process for previewing font selections in the active document. Second, Corel asserts that the Microsoft MSJ Products satisfy the "updating the display of the active document in the document display windows" limitation because the scratch document appears in the user's "client area" or "canvas." In order to prove literal infringement, however, Corel must show both 1) that the display of the active document is updated and 2) that this occurs in the "document display windows." Even if there is a dispute as to whether the font preview is shown in the document display windows, Corel, as discussed above, has not pointed to evidence that the preview is displayed in the active document. Third, Corel contends that the Microsoft MSJ Products literally infringe because they intentionally create the illusion that the font previews are displayed in the active document. But "infringement is not a question of user perception of operation, but of actual operation." *Hilgraeve Corp. v. McAfee Assocs., Inc.*, 224 F.3d 1349, 1352, 1355 (Fed. Cir. 2000).

Accordingly, the court grants summary judgment on Corel's literal infringement claims against the Microsoft MSJ Products.

b) Infringement Under the Doctrine of Equivalents

"If an asserted claim does not literally read on an accused product, infringement may still occur under the doctrine of equivalents if there is not a substantial difference between the limitations of the claim and the accused product." *Bayer AG v. Elan Pharm. Rsch. Corp.*, 212 F.3d 1241, 1250 (Fed. Cir. 2000); *accord Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 727 (2002) ("[A] patent protects its holder against efforts of copyists to evade liability for infringement by making only insubstantial changes to a patented invention."). "Infringement under the doctrine of equivalents is a question of fact." *Bayer*, 212 F.3d at 1251.

The doctrine of equivalents is limited by the doctrine of prosecution history estoppel, which "requires that the claims of a patent be interpreted in light of the proceedings in the PTO during the application process." *Festo*, 535 U.S. at 733. Under this doctrine, when "the patentee originally claimed the subject matter alleged to infringe but then narrowed the claim in response to a rejection, he may not argue that the surrendered territory comprised unforeseen subject matter that should be deemed equivalent to the literal claims of the issued patent." *Id.* at 733–34. In other words, the doctrine of equivalents precludes "a patentee from regaining, through litigation, coverage of subject matter relinquished during prosecution of the application for the patent." *Wang Lab'ys, Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1577–78 (Fed. Cir. 1997).

Microsoft argues that prosecution history estoppel bars Corel from arguing that the Microsoft MSJ Products infringe the '483 patent under the doctrine of equivalents. Citing a 2010 amendment that Corel made to the claim language, Microsoft asserts that it "expressly added a limitation requiring the preview to occur in the user's active document, not in any other location." But Microsoft misreads the amendment. The 2010 amendment, which marks additions to the claim language with underlined text, reads as follows:

21

> updating <u>the display of the active document in</u> the document display windows to show the impact of the inserted font <u>command code</u> on the <u>display of the</u> text [[in]]<u>of</u> the active document<u>, without confirmation being received from the user</u>;

Although the amendment added a second reference to the active document in this limitation, the pre-amendment claim language already specified that the updates to the font would be shown "in the active document."[10] Indeed, as far back as 2004, Corel's proposed claim language stated that its invention inserted "corresponding code into said active document."

The Supreme Court has repeatedly confirmed that, under the doctrine of prosecution history estoppel, the patentee surrenders the territory between broader pre-amendment claim language and narrower post-amendment claim language if the amendment is made to secure the patent. *Festo*, 535 U.S. at 740 ("A patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim."); *Exhibit Supply Co. v. Ace Pats. Corp.*, 315 U.S. 126, 136 (1942) ("By the amendment [the patentee] recognized and emphasized the difference between the two phrases and proclaimed his abandonment of all that is embraced in that difference."); *Weber Elec. Co. v. E.H. Freeman Elec. Co.*, 256 U.S. 668, 677 (1921) ("Having thus narrowed his claim . . . in order to obtain a patent the patentee may not by construction, or by resort to the doctrine of equivalents, give to the claim the larger scope which it might have had without the amendments . . . ."). The patentee may not reclaim that territory through the doctrine of equivalents. Microsoft, however, has failed to point to an amendment narrowing some less restrictive iteration of the claim language to require the font preview to occur in the active document. Accordingly, it has not shown that

---

[10] The pre-amendment claim limitation read: "updating the document display windows to show the impact of the inserted font on the text in the active document."

prosecution history estoppel bars the application of the doctrine of equivalents. The court, therefore, denies summary judgment on Microsoft's claim that the Microsoft MSJ Products do not infringe the '483 patent under the doctrine of equivalents.

        2)      Microsoft MSJ Features

Microsoft also argues that the Microsoft MSJ Features do not infringe the '483 patent. In this section of its motion for summary judgment, Microsoft briefly lists seven features that it asserts do not infringe: 1) "Features involving styles," 2) "Features involving tables," 3) "Features involving changing background color," 4) "Drop caps," 5) "Features involving outlines or effects," 6) "Features involving 'SmartArt,'" and 7) 'Past special' and 'Smart paste.'" Other than listing a few additional labels for subcategories within each of these features—e.g., "WordArt styles" and "shape fill"—Microsoft does not provide any definition for these features or explain precisely how these features function across the many Microsoft products at issue in this action. After listing each feature, Microsoft asserts a conclusory one- or two-sentence argument as to why each feature does not infringe as a matter of law. For example, the sum total of Microsoft's argument that the SmartArt features do not infringe is "SmartArt and charts are not fonts."

A party moving for summary judgment on patent infringement "bears the initial burden of coming forward with sufficient evidence to demonstrate that there is no material issue of fact that would preclude summary judgment, and that it is entitled to judgment as a matter of law." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 806 (Fed. Cir. 1999). Only if the movant meets this initial burden, does the burden shift to the opposing party. *Id.* Microsoft's cursory arguments do not satisfy its initial burden of showing that it is entitled to summary judgment. It does not describe precisely what these features are or how they function within the accused Microsoft products. And other than a conclusory sentence or two, Microsoft does not adequately explain why

it is entitled to summary judgment for each feature. Nor does it state whether it requests summary judgment for literal infringement, infringement under the doctrine of equivalents, or both. The court may not construct arguments on behalf of Microsoft based on the brief cues presented. Because Microsoft has failed to shoulder its initial burden, the court denies summary judgment as to the Microsoft MSJ Features. *See Kangaroos U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1578 (Fed. Cir. 1985). ("The Federal Rules do not contemplate that a court may dispose of a cause by summary judgment, when the basis for the judgment was not raised by the movant with sufficient precision for the nonmovant to respond." (citation omitted)).

C.    *The '309 Patent*

Microsoft argues that it is entitled to summary judgment on Corel's infringement cause of action based on the '309 patent because Claims 2 and 3 of this patent are invalid as anticipated under 35 U.S.C. § 102. "A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631 (Fed. Cir. 1987). The prior art reference must be "in public use or on sale in this country, more than one year prior to the date of the application for patent." 35 U.S.C. § 102 (2002).[11] "While anticipation is a question of fact, 'it may be decided on summary judgment if the record reveals no genuine dispute of material fact.'" *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1331 (Fed. Cir. 2010).

---

[11] Because Corel filed its application for the '309 patent prior to March 16, 2013, the court applies the pre-America Invents Act version of § 102 in this action. *See* Leahy–Smith America Invents Act, Pub. L. No. 112-29, September 16, 2011, 125 Stat. 284, 293.

Microsoft contends that the '309 patent is anticipated by its Paint program, which was included in the Windows NT 4.0 operating system. Paint was released to the public in July 1996, well over a year before Corel filed its application for the '309 patent in August 1998. Paint allows users to create a text box within a document. As the name implies, the user can insert text inside the text box. The user can then click on a border of the text box and drag it with the mouse button depressed, enlarging or shrinking its dimensions. While the user is performing this operation, the text inside the text box will move and reflow in response to changes to the borders of the text box. In order to determine whether Claims 2 and 3 are anticipated by Paint, the court must compare each element of these claims to this prior art.

    1)  Claim 1

Claim 2 is dependent upon Claim 1 of the '309 patent. Thus, even though Claim 1 is no longer at issue in this action,[12] the court first looks to the elements of Claim 1 to determine whether each one can be found in Paint. Claim 1 reads as follows:

> A method of providing real time preview of changes to guidelines or margins in a computer system operating a document editing program, comprising the steps of:
>
> storing an active document in a memory medium;
>
> displaying at least part of an active document in a document display window including document guidelines or margins;
>
> responding to one of said guidelines or margins being grabbed and relocated f[r]om a first location to a second location by:

---

[12] During a reexamination proceeding, the PTO invalidated Claim 1 as being obvious in light of the prior art.

> inserting code corresponding to said guideline or margin at said second location into said memory medium storing said active document; and
>
> removing code corresponding to said guideline or margin at said first location from said memory medium storing said active document.

The preamble to Claim 1 maps onto Paint. The parties agreed that the phase "real time preview" means "a preview in which the full impact of a change on an entire document is shown prior to a user accepting the change." Paint performs such a preview by showing the full impact of a change to a text box border by showing how text within the box will appear before the user accepts the change by releasing the mouse button. Moreover, Paint is a document editing program.

It is also undisputed that Paint stores an active document in memory and that it displays the active document in a document display window "including document guidelines or margins." As discussed above, document guidelines are non-printing lines within a document that aid in aligning text and other objects. Paint displays a dashed non-printing line around a text box. When this dashed line is grabbed and moved by the user, text within the box automatically aligns with the new position of the dashed line. Thus, the border lines of the text box are guidelines because they are non-printing lines within a document used to align text.

Finally, Paint responds to one of the guides being grabbed and moved by the user from the first location to a second location by removing code associated with the first location and inserting code associated with the second location. Paint causes the text inside the box to move and reflow, showing how it will appear at the second location before the user commits to the change by releasing the mouse button.

Accordingly, all of the elements of Claim 1 are present in Paint.

26

2)      Claim 2

Claim 2 of the '309 patent states: "The method as claimed in claim 1 wherein said step of removing code further comprises the step of: refreshing said document display window." There is no dispute that Paint satisfies this additional element by refreshing the display window to show the impact of changes to a text box guideline to the user.

Because Paint expresses all of the elements of Claim 1 and Claim 2, this product anticipates Claim 2. Therefore, Claim 2 is invalid and Microsoft is entitled to summary judgment on this claim.

3)      Claim 3

Claim 3 of the '309 patent reads: "The method as claimed in claim 2 further comprising the steps of: responding to said grabbed guideline or margin being released by pushing said code corresponding to said grabbed guideline or margin in said second location onto an Undo Stack." The undo stack permits the user to reverse a change to the location of a guideline by clicking on an undo button. It is undisputed that Paint stores the old location of a text box guideline in the undo stack so that the user can undo the change.

Thus, all of the elements of Claim 1, Claim 2, and Claim 3 are present in Paint. Claim 3 is invalid because it is anticipated by Paint, and Microsoft is entitled to summary judgment on this claim as well.

4)      Corel's Arguments Against Summary Judgment on Anticipation

Corel does not raise any disputes of material fact regarding how Paint operates. Instead, it argues that some of Paint's functions preclude a finding that this program anticipates the '309 patent. First, Corel asserts that Paint does not anticipate the '309 patent because a text box in Paint does not establish a boundary for or align content outside of the text box. If a text box in Paint is

expanded, content outside of the box does not adjust. Instead, the content of the text box overlaps content located outside of the box. But Corel does not point to any limitation found in Claims 1, 2, or 3 of the '309 patent that require an adjustment to a guideline to set boundaries for or align multiple pieces of content. All that is required is the removal of code for the first guideline location and the entry of code for the second location to show the effect of the move. Paint performs this function.

Second, Corel points to the fact that the guidelines surrounding a text box generated in Paint disappear when the user clicks outside of the text box. At that point, the text box becomes fixed, and the user can no longer adjust the guidelines surrounding the box. Once again, however, Corel does not assert that this function of Paint falls outside of any limitation of the '309 patent. The relevant claims of this patent only require the ability to move a guideline from one location to a second location. They do not require unlimited adjustments.

Third, Corel contends that a text box cannot be used to establish a document margin in Paint. But this does not save the '309 patent claims from Microsoft's anticipation argument. The relevant claims of this patent describe a method for previewing adjustments to document guidelines *or* margins. "When a claim covers several structures or compositions, either generically or as alternatives, the claim is deemed anticipated if any of the structures or compositions within the scope of the claim is known in the prior art." *Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001) (holding that a patent that covered two-, three-, or four-digit year dates was anticipated by a patent that covered only two-digit year dates). Thus, in order to anticipate Claims 2 and 3 of the '309 patent, Paint need only embody all of the elements of these claims in relation to guidelines. Because Paint's guideline preview function anticipates these claims, Claims 2 and 3 are invalid in their entirety.

In short, the court rejects all of Corel's arguments against finding that Paint anticipates Claims 2 and 3 of the '309 patent. The court finds that these claims are invalid as a matter of law and grants summary judgment in favor of Microsoft on Corel's cause of action based on the '309 patent.

## CONCLUSION AND ORDER

For the foregoing reasons, the court rules as follows:

1)  The court resolves the parties' construction disputes as follows:

    a.  The court rejects Microsoft's proposed interpretation of the phrase, "updating the display of the active document in the document display windows to show the impact of the inserted font command code on the display of the text of the active document," in the '483 patent and finds that no construction is required.

    b.  The court rejects Microsoft's proposed interpretation of the word "font" in the '483 patent and finds that no construction is required at this time.

    c.  The court rejects Microsoft's argument that the "storing an active document" step of the '483 patent must come before the step of "displaying at least part of the active document." The court agrees with Microsoft that the "displaying at least part of the active document" step must precede the step of "updating the display of the active document."

    d.  The court construes the phrase "document guidelines or margins" in the '309 patent to mean "guidelines or margins within a document."

2)  The court grants in part and denies in part Microsoft's motion for summary judgment on Corel's '483 patent infringement cause of action. The court grants summary judgment on Corel's claim that the Microsoft MSJ Products literally infringe the '483

patent. The court denies summary judgment on Microsoft's claim that the Microsoft MSJ Products do not infringe the '483 patent under the doctrine of equivalents. Finally, the court denies summary judgment on Corel's claim that the Microsoft MSJ Features infringe the '483 patent.

3) The court grants Microsoft's motion for summary judgment on Corel's '309 patent infringement cause of action because the asserted claims of this patent are invalid.

DATED February 12, 2024.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge