James S. Jardine (jjardine@rqn.com / SBN 1647)
Beth J. Ranschau (branschau@rqn.com / SBN 13846)
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, UT  84111
Telephone:  (801) 532-1500
Facsimile:   (801) 532-7543

Jonathan J. Lamberson (lamberson@whitecase.com / *Pro Hac Vice*)
Henry Huang (henry.huang@whitecase.com / *Pro Hac Vice*)
WHITE & CASE LLP
3000 El Camino Real
2 Palo Alto Square, Suite 900
Palo Alto, CA  940306
Telephone:  (650) 213-0300
Facsimile:   (650) 213-8158

Attorneys for Defendant
MICROSOFT CORPORATION

*Additional counsel listed on signature page*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| COREL SOFTWARE, LLC,<br><br>            Plaintiff,<br><br>      v.<br><br>MICROSOFT CORPORATION,<br><br>            Defendant. | Case No. 2:15-cv-00528-JNP-DBP<br><br>**DEFENDANT MICROSOFT CORPORATION'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY**<br><br>██████████████<br><br>District Judge Jill N. Parrish<br>Chief Magistrate Judge Dustin B. Pead |

# **TABLE OF CONTENTS**

I.    ARGUMENT ..........................................................................................................1

A.    The Asserted Claims are Obvious.........................................................1

1.    Photoshop 4 Had Fonts With Font Command Codes ...............2

2.    Photoshop 4 Identifies Font Color via Hovering .....................4

3.    The Dependent Claims are Obvious ........................................7

B.    Claim 1 And Its Dependent Claims Are Not Infringed .......................7

C.    The Accused Excel Products Do Not Infringe......................................9

D.    Corel's Damages Claim is Subject to Quasi-Estoppel........................11

E.    Corel Is Not Entitled to Pre-Suit Damages ........................................12

F.    Corel Should Not Be Permitted to Seek Damages for Foreign
Sales ...................................................................................................13

G.    Corel's Three Damages Theories Should Be Excluded......................14

1.    The Office 2007 Model Is Unreliable and Should be
Excluded ...............................................................................15

2.    The Forrester Model is Unreliable and Should be
Excluded ...............................................................................17

3.    The Lucent Model is Unreliable and Should be
Excluded ...............................................................................18

II.   RESPONSES TO COREL'S "ADDITIONAL MATERIAL FACTS"..........................20

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*3Form, Inc. v. Lumicor, Inc.*,
    No: 2:12-cv-00293-CW, 2015 U.S. Dist. LEXIS 172282 (Dec. 28, 2015)
    (Waddoups, J.) ...........................................................................................................1

*Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*,
    841 F.3d 1334 (Fed. Cir. 2016)..................................................................................5

*Amgen Inc. v. Hoechst Marion Roussel*,
    314 F.3d 1313 (Fed. Cir. 2003)..................................................................................3

*Apple, Inc. v. Samsung Elecs. Co.*,
    No. 11-CV-01846, 2012 U.S. Dist. LEXIS 90877 (N.D. Cal. Jun. 29, 2012)........15

*AquaTex Indus. v. Techniche Solutions*,
    479 F.3d 1320 (Fed. Cir. 2007)................................................................................10

*Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*,
    876 F.3d 1350 (Fed. Cir. 2017)................................................................................12

*Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*,
    709 F.3d 1348 (Fed. Cir. 2013)..................................................................................8

*In re Baker Hughes Inc.*,
    215 F.3d 1297 (Fed. Cir. 2000)................................................................................11

*Brumfield, Tr. for Ascent Tr. v. IBG LLC*,
    97 F.4th 854 (Fed. Cir. 2024) ............................................................................13, 14

*Cluck v. Commissioner*,
    105 T.C. 324 (1995)..................................................................................................11

*EcoFactor, Inc. v. Google LLC*,
    Case No. 2023-1101, Dkt. 76 (Fed. Cir. Sep. 25, 2024).........................................19

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
    575 F.3d 1312 (Fed. Cir. 2009)..................................................................................6

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018)..........................................................................15, 16

*Genuine Enabling Tech. LLC v. Nintendo Co.*,
   29 F.4th 1365 (Fed. Cir. 2022) ..............................................................5

*Hytera Communs. Co. v. Motorola Sols., Inc.*,
   841 Fed. Appx. 210 (Fed. Cir. 2021) (unpublished) ...............................7

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
   327 F.3d 1364 (Fed. Cir. 2003) ..............................................................5

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007) ................................................................................1

*MacPike v. Am. Honda Motor Co.*,
   No. 92-30094, 1993 U.S. Dist. LEXIS 18970 (N.D. Fla. Sep. 30, 1993) ...............................13

*Medtronic, Inc. v. Axonics Modulation Techs., Inc.*,
   CV 19-02115-DOC-JDE, 2024 WL 4406929 (C.D. Cal. Aug. 29, 2024)
   (unpublished) ........................................................................................12

*Mike's Train House, Inc. v. Lionel, L.L.C.*,
   472 F.3d 398 (6th Cir. 2006) ................................................................14

*Mirror Worlds, LLC v. Apple Inc.*,
   692 F.3d 1351 (Fed. Cir. 2012) ..............................................................9

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ................................................................................3

*Radio Sys. Corp. v. Lalor*,
   709 F.3d 1124 (Fed. Cir. 2013) ............................................................11

*Really Right Stuff v. Field Optics Rsch.*,
   No. 2:20-cv-00345-DBB-DBP, 2024 U.S. Dist. LEXIS 97436 (May 31, 2024)
   (Barlow, J.) ..............................................................................................1

*Rembrandt Soc. Media, LP v. Facebook, Inc.*,
   640 Fed. Appx. 943 (Fed. Cir. 2016) ......................................................9

*Sandisk Corp. v. Memorex Prods.*,
   415 F.3d 1278 (Fed. Cir. 2005) ..............................................................6

*TecSec, Inc. v. Adobe Inc.*,
   No. 1:10-cv-115, 2019 U.S. Dist. LEXIS 42997 (E.D. Va. Mar. 14, 2019) ...........................13

*Union Carbide Corp. v. United States*,
   612 F.2d 558 (Ct. Cl. 1979) ..................................................................11

*Upsher-Smith Labs. v. Pamlab, L.L.C.*,
    412 F.3d 1319 (Fed. Cir. 2005)..............................................................................................8

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014).......................................................................15, 16, 17, 18

**Statutes**

35 U.S.C. § 301 ............................................................................................................................1

# I.   ARGUMENT

## A.  The Asserted Claims are Obvious

Corel does not dispute that Photoshop 4 is prior art (*i.e.*, it is within the "scope and content of the prior art").  Corel does not dispute the level of ordinary skill in the art.  Corel does not discuss any secondary considerations of non-obviousness.  Finally, Corel does not suggest Photoshop 4 is incapable of performing any of the functions Microsoft demonstrated in its opening brief.  The only disputes are legal, specifically claim construction.

Before addressing the merits, Corel argues (at 14) that "Microsoft has not cited any case granting summary judgment of obviousness," and that granting such a motion would be "unprecedented."  This is wrong: Microsoft cited *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), a seminal case on obviousness where the district court granted summary judgment and the Supreme Court affirmed.  *Id*. at 412, 427.  There, the Court held, "[t]he ultimate judgment of obviousness is a legal determination," and when there are no material disputes over the scope and content of the prior art or the level of ordinary skill in the art, "summary judgment is appropriate."  *Id*.  Courts in this district and elsewhere have granted summary judgment of obviousness based on *KSR*.  *See, e.g., Really Right Stuff v. Field Optics Rsch*., No. 2:20-cv-00345-DBB-DBP, 2024 U.S. Dist. LEXIS 97436 (May 31, 2024) (Barlow, J.); *3Form, Inc. v. Lumicor, Inc*., No: 2:12-cv-00293-CW, 2015 U.S. Dist. LEXIS 172282, at *45-53 (Dec. 28, 2015) (Waddoups, J.).

Corel also argues (at 15) that the Patent Office ("USPTO") considered Photoshop 4 in a reexamination proceeding.  This misstates the record.  First, the USPTO cannot consider system references in reexamination, it can only consider patents and printed publications.  *See* 35 U.S.C.

§ 301.  This means Microsoft could not show the USPTO how Photoshop 4 worked, nor could it submit Adobe source code.  After reviewing a book on Photoshop 4, the USPTO said it "teaches real-time previewing in an active document."  [Dkt. 322-14 at JA-06684].  After that finding, the USPTO never discussed Photoshop 4 again, it focused on manuals for CorelDraw.  [*See id.* at JA-06709-16].  Because the USPTO never made further findings on Photoshop 4, there is nothing for this Court to defer to.

### 1.      Photoshop 4 Had Fonts With Font Command Codes

During claim construction, Corel told this Court that a "font" is any "attribute" of text, with color being one example.  [*See* Dkt. 321 at 18; Dkt. 321-1, ¶¶ 53-54].  Corel admits (at 15) that Photoshop 4 has "text," but says the text in Photoshop 4 has no "attributes."  This is nonsensical.  Microsoft's opening brief showed screenshots from Photoshop 4 with text, and that text clearly has a color (*e.g.*, yellow or black).  [Mot. at 9-10].  This is an "attribute" the Court can see with its own eyes.

Corel's arguments are not factual, they are legal, specifically claim construction.  Corel argues "fonts" must allow a user to "select, modify, and edit" ***individual characters***.  [*See* Opp. at 15, 18.]  This is wrong, for multiple reasons.  First, nothing in the '483 patent requires selecting individual characters.  The only examples of previewing in the '483 patent involve changing multiple characters.  ['483 patent at 1:46-67].  The independent claims do not specify how much text must be in the document, nor do they require selecting text.  Dependent claim 7 requires selecting text (meaning independent claim 1 does not require it), but claim 7 does not say how much text the user must select.  Corel's proposed construction, which requires selecting individual characters, ignores the claim language.

Corel's new construction is also inconsistent with its prior positions. Specifically, Corel's expert previously testified that "font" and "font command code" are not limited to any specific implementation. [Ex. 16 at 88:1-14; Ex. 31 at 82:4-23, 89:12-19]. Corel also previously argued that during prosecution, when it changed the claim language from "changes to **text**" to "changes to **fonts**," this modification did not alter claim scope. [Dkt. 331 at 7]. The Court agreed with Corel, and declined to narrow the definition of "font" based on this change. [Dkt. 361 at 11]. Corel cannot now assert that there is a meaningful difference between text and fonts. *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (discussing judicial estoppel).

Corel's argument is also inconsistent with its infringement contentions. In opposing summary judgment, Corel gave the Court examples of Microsoft's alleged infringement where the accused products change the color of blocks of text, not individual characters. [Dkt. 333-24 at 11, 16-24, 29-46]. Corel also accused pasting text into a blank document—a scenario where the user cannot select text because the document has no text. [*Id*. at 38]. Corel also says highlighting text (*i.e.*, changing the color ***behind*** the text) is an example of changing an attribute of the text. [Ex. 14, Appx. D]. This shows how broadly Corel and its expert read "font" and "font command code" for infringement purposes—as any "attribute" of text, and any code specifying that attribute. [*See* Dkt. 103 at 9; Dkt. 103-1, ¶ 80; Dkt. 253 at 1; Dkt. 321]. The Court must apply this same claim scope for invalidity. *See Amgen Inc. v. Hoechst Marion Roussel*, 314 F.3d 1313, 1330 (Fed. Cir. 2003).

Finally, even if the Court were to adopt Corel's new construction, Photoshop 4 would still practice the limitation. In Photoshop 4, a user could type a single character (just the letter "A," for example). The user could change the color of just that character. Alternatively, the user

could type multiple characters, but put each character in its own layer. Then the user could preview changes to one character at a time, as shown below. Thus even under Corel's erroneous construction, the claims are still invalid.



### 2. Photoshop 4 Identifies Font Color via Hovering

Corel acknowledges (at 17) that to preview in Photoshop 4, a user must do several things. First, the user must "grab" the slider by placing the mouse over it and holding down the mouse button. Next, the user must move the slider to a new location while keeping the mouse button held down. Finally, the user must pause mouse movement—the mouse must "remain stationary" in the new location for a period of time. That final step is hovering. In other words, Corel admits Photoshop 4 previews while hovering.[1]

Once again, Corel relies on new claim construction positions to attempt to avoid invalidity. First, Corel argues the term "hovering" cannot encompass "selecting and dragging." This argument is irrelevant because the preview in Photoshop 4 does not occur while "selecting

---

[1] Corel does not dispute that the Adobe source code ███████████████████████████
███████████████████████████████████████████████████████████████████████████████
[Ex. 12, ¶ 153].

and dragging."  The screen will not update until the user stops dragging the slider and starts hovering.  Next, Corel argues "hovering" means "not clicking," and that the two are "mutually exclusive."  Corel gives no intrinsic support for this construction, and it ignores intrinsic evidence that contradicts it.  For example, Corel ignores multiple places in the '483 patent that describe clicking while hovering.  [*See* '483 patent at 12:6-8 (describing an embodiment where the user "single-click[s] with a mouse cursor hovering over [an] object"); *id*. at 10:7-9 (describing a user "clicking and holding, with a mouse cursor hovering")].  Corel also ignores that the patent defines hovering as "[t]he cursor being positioned above a command" ('483 patent, 6:53-55), which says nothing about whether the mouse button is up or down.  Corel never suggests the file history or any intrinsic evidence supports its narrower construction, so the Court must reject it.  *See Alfred E. Mann Found. for Sci. Research v. Cochlear Corp*., 841 F.3d 1334, 1340 (Fed. Cir. 2016); *Genuine Enabling Tech. LLC v. Nintendo Co*., 29 F.4th 1365, 1375 (Fed. Cir. 2022).

Corel next argues that the transitional phrase "'comprising' does not render each limitation within the claim open-ended."  This is just another way of saying Photoshop 4 must practice the claim as written, but it clearly does.  The claims require "identifying a font by hovering of the cursor for a predetermined period of time."  No preview occurs in Photoshop 4 when the user clicks, or when they move the slider.  The preview only occurs when the user hovers, so the claim is met.  It is legally irrelevant whether the user performs other steps before hovering.  *See Invitrogen Corp. v. Biocrest Mfg., L.P*., 327 F.3d 1364, 1368 (Fed. Cir. 2003).

Corel next argues that the dialog box in Photoshop 4 is not "of the document display window."  Here again, Corel ignores express disclosures in the patent that say "available

commands may be presented and selected from menus and **toolbars which may be set up as …**
**dialog boxes**."   ['483 patent at 3:63-4:2; 6:45-50 (emphasis added)].   Corel's argument that a
dialog box cannot be the claimed menu or toolbar excludes this preferred embodiment, which is
improper.  *See Sandisk Corp. v. Memorex Prods*., 415 F.3d 1278, 1285 (Fed. Cir. 2005).   Corel
also does not explain why (1) other dialog boxes in Photoshop 4 are "of the document display
window," just not the specific dialog Microsoft relies on, or (2) why accused pop-up menus in
Microsoft Word are "of the document display window," but the menus in Photoshop 4 are not.
No reasonable jury could credit these inconsistent positions.

Finally, Corel argues Photoshop 4 does not practice the claim because the user might not
hover the mouse directly over the slider, they may move the mouse further down the page.  [*See*
Opp. at 18, citing Bederson Decl., ¶14, Ex. 6].   This is irrelevant because the user could also
hover the mouse over the slider itself, moving over specific locations corresponding to hue or
saturation values, which satisfies the claim.   [*See, e.g.,* Mot. at 10 (showing mouse over
Lightness slider)].   The Court should reject Corel's effort to distinguish Photoshop 4 based on
functionality beyond that which is claimed.  *See Exergen Corp. v. Wal-Mart Stores, Inc*., 575
F.3d 1312, 1319 (Fed. Cir. 2009).[2]

Photoshop 4 did what Corel said it invented: it showed the user font changes in the
document while hovering.   Once a person of skill knew how to hover preview, Corel said

---

[2] Here again, Corel is being inconsistent.  It suggests its claims do not cover previews that use
"horizontal mouse movement," but the claims do not specify mouse direction, and Corel accuses
Microsoft features that use horizontal menus.  [*See, e.g.,* Dkt. 333-24 at 9 (text styles), 38 (paste
special)].  To the extent Corel is suggesting the slider must give a visual indication of what color
the new font will be, the claims do not require that, and not all accused features show font colors
before previewing.  [*See, e.g., id*. at 38 (paste special), 37 (SmartArt)].

implementation can be done using "routines…well known in the art." ['483 patent at 5:2-3]. Since its claims are not new or novel, its patent is invalid as obvious.

### 3.    The Dependent Claims are Obvious

Corel does not make any arguments for dependent claim 6.  For claim 7, Corel repeats its argument that the claims require selecting individual characters.  As discussed above, that is incorrect, but regardless, Photoshop 4 included such functionality.  Finally, Corel argues claims 2, 3 and 11 are not obvious, but it does not explain why.  Corel's patent does not suggest there is any meaningful difference between previewing font face versus font color, nor does it suggest any meaningful difference in implementing previews in a word processor versus a spreadsheet. Implementation instead relies on "routines…well known in the art" ('483 patent at 5:2-3, 7:49-62), so these dependent claims are also obvious.

### B.  Claim 1 And Its Dependent Claims Are Not Infringed

Corel argues (at 19) that the final two steps of claim 1 are "conditional and mutually exclusive," and that this means the accused products need not practice both limitations.  Corel is wrong on the law, and wrong on what its claims require.

On the law, Corel relies entirely on an unpublished Federal Circuit case (*Cybersettle*), as well as two district court decisions citing it.  In a more recent unpublished decision, however, the Federal Circuit said *Cybersettle* was "dictum," that *Cybersettle* is "nonbinding," and that it "conflicts with" earlier decisions about how to interpret method claims.  *See Hytera Communs. Co. v. Motorola Sols., Inc*., 841 Fed. Appx. 210, 216 (Fed. Cir. 2021) (unpublished).  Given these competing opinions, neither of which is precedential, the Court should rely on precedential decisions, which uniformly say that to infringe a method claim, a user must perform "each and

every step of the method" as written.  *See Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1362 (Fed. Cir. 2013).  Because Corel has not shown any user performed the last two claim steps as written (*i.e.*, for the same "font command code"), summary judgment is appropriate.

Alternatively, the Court can avoid this legal issue by finding the '483 patent claims are not "conditional and mutually exclusive."  The claims require "pushing" a font command code when confirmation is received, then "removing" that same font command code when subsequent confirmation is not received (or when another font command code is identified).  Importantly, the Court concluded these method steps need not be performed in the order recited in the claim. [Dkt. 361 at 12-13].  This means a user could, for example, preview font face Times New Roman, decide not to accept it by previewing a different font, then preview Times New Roman again, then accept it.  In this scenario, the same font is both "removed" (by not accepting) and "pushed" (by accepting).  To be clear, this is not the scenario Corel analyzed in its expert report, likely because it has no proof any Microsoft customer ever performed this specific series of steps, and because Corel cannot seek billions of dollars in damages for such a specific infringement scenario.  Regardless, Corel could have accused scenarios where the same font is both confirmed and not confirmed.  Because the '483 patent claims are not "conditional and mutually exclusive," *Cybersettle* does not apply, and Corel must show the last two method steps are practiced.  Because Corel does not make such a showing, summary judgment is appropriate.[3]

---

[3] In footnote 3, Corel says Dr. Olsen applied the claims this same way for invalidity.  That was required.  *See Upsher-Smith Labs. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005) ("A century-old axiom of patent law holds that a product which would literally infringe if later in time anticipates if earlier.").  There is no inconsistency: if the Court rejects Corel's claim

### C. The Accused Excel Products Do Not Infringe

Microsoft's opening brief noted that Corel's expert refused to identify what in Excel is a "font command code."  Corel does not dispute this, nor does its opposition identify the font command code in Excel.  Instead, Corel doubles down, arguing (at 21) that its failure to identify a "font command code" is intentional and acceptable because it can rely on "circumstantial evidence" that such a code is present.  As an initial matter, circumstantial evidence is unnecessary here because both sides' experts know what is in the "XF" data structure in Excel.  That data structure is defined in Microsoft source code and described in Microsoft documents, both of which show its contents.  ██████████████████████████████████████
████████████████████.  [Dkt. 404-48, Ex. 86, p.55].  Yet when Microsoft asked Corel's expert whether the IFNT was a "font command code," he refused to say.  [Ex. 16 at 86:2-87:5].  If Corel's expert cannot tell, after reviewing this evidence, whether the IFNT (or anything else in the XF) is a font command code, a lay jury cannot be expected to make that determination based on that same evidence.

More generally, even if Corel is permitted to rely on circumstantial evidence, it still must show that each claim limitation is met.  *See Mirror Worlds, LLC v. Apple Inc*., 692 F.3d 1351, 1359 (Fed. Cir. 2012).  Here, the claims do not merely require the presence of a "font command code," they require that the same "font command code" must (1) be associated with fonts in the font drop-down menu, (2) be inserted into the document, (3) cause the text in the document to change, (4) be placed on the undo stack when the font is confirmed, and (5) be removed from the document when the font is not confirmed.  Even if Corel can use circumstantial evidence to

construction, it should find no infringement, and Microsoft's invalidity challenges become moot. *See Rembrandt Soc. Media, LP v. Facebook, Inc*., 640 Fed. Appx. 943, 949 (Fed. Cir. 2016).

suggest there may be a "font command code" in an XF data structure in Excel, Corel gives no evidence (direct or circumstantial) that this same "font command code" (whatever it is) satisfies all the above limitations.  Corel refers the Court to its expert report, but its expert analyzes different things for different limitations.  For example, when discussing the "inserting" and "pushing" limitations, Dr. Bederson does not discuss the XF data structure, he discusses a variable called an IXFE.  [Dkt. 404-48, Ex. 86, ¶¶ 589, 622].  ██████████████.  [*Id.*, p.55].[4]

The reason Corel and its expert refuse to identify any "font command code" in Excel is because they cannot do so consistently.  If they identify the font index (IFNT) as the "font command code" for the "identifying" limitation, and the IXFE as the "font command code" for the "inserting" and "pushing" limitations, that would be clearly inconsistent.  Instead of being clearly inconsistent, Corel and its expert choose to be purposefully vague, suggesting (without saying) that perhaps the IFNT and IXFE are each "font command codes," but refusing to confirm their position.  Corel cannot meet its burden through such hand-waving.

Finally, Corel says Dr. Bederson gave a doctrine of equivalents ("DOE") opinion for the "font command code" limitation for Excel, but this is false: the portion of his report where Dr. Bederson analyzes "font command code" under DOE only discusses Word, it never mentions Excel, the XF data structure, an IFNT, or an IXFE.  [Dkt. 404-48, Ex. 86, ¶¶ 723-737].  To the extent Corel is suggesting its expert's bare assertion that DOE applies is sufficient, that is incorrect: DOE requires limitation-by-limitation analysis.  *See AquaTex Indus. v. Techniche Solutions*, 479 F.3d 1320, 1328-29 (Fed. Cir. 2007).

---

[4] Notably, when Dr. Bederson was asked whether an IXFE is a "font command code," he once again refused to answer.  [Ex. 16 at 90:17-91:10].

### D.  Corel's Damages Claim is Subject to Quasi-Estoppel

Corel argues quasi-estoppel has never been applied in a case involving patent damages, but that just shows how extraordinary Corel's actions were.  It is unlikely any other patentee valued its patent for tax purposes, then attempted to inflate that value by three orders of magnitude.  The doctrine of quasi-estoppel exists to prevent such an about-face.

Corel argues (at 23) that quasi-estoppel does not apply because Corel Corporation and Corel Software are "distinct and separate legal entities," ███████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████.  [*See* Ex. 19 at 39:3-5]. Quasi-estoppel applies when the representation was made by a related taxpayer.  *See Cluck v. Commissioner*, 105 T.C. 324, 334-35 (1995).[5]

Corel next argues that the 2013 tax valuation was for a "different transaction" from the damages at issue here.  Corel relies on *In re Baker Hughes Inc.*, 215 F.3d 1297, 1301 (Fed. Cir. 2000), for its "same transaction" test, but ignores that the case also says quasi-estoppel applies in cases involving "the same facts."  Further, *Baker Hughes* relies on *Union Carbide Corp. v. United States*, 612 F.2d 558, 566 (Ct. Cl. 1979), for its test, and *Union Carbide* says the relevant question is whether "the earlier position was then to the advantage of the taxpayer but … it is now to the taxpayer's advantage to shift his position."  In other words, the question is not whether this case is "related" to the prior transfer, the question is whether Corel is attempting to change position on the value of the '483 patent.  That value is a fact, not a transaction.

---

[5] This is no different from other forms of equitable estoppel, which apply to successors-in-interest.  *See Radio Sys. Corp. v. Lalor*, 709 F.3d 1124, 1131 (Fed. Cir. 2013).

Finally, Corel suggests inter-company transactions are irrelevant to damages, citing *Medtronic, Inc. v. Axonics Modulation Techs., Inc.*, CV 19-02115-DOC-JDE, 2024 WL 4406929, at *44 (C.D. Cal. Aug. 29, 2024) (unpublished).  The *Medtronic* case is so heavily redacted it is difficult to tell what the agreements at issue said, but there is no indication they were used for tax purposes, so *Medtronic* is irrelevant to quasi-estoppel.

### E.  Corel Is Not Entitled to Pre-Suit Damages

Corel bears the burden to demonstrate it complied with the patent marking statute.  *See Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1366 (Fed. Cir. 2017). Corel appears to concede (at 25) that it has no evidence it marked any embodying products prior to September 2013, so the Court should grant at least partial summary judgment.  As for sales made between September 2013 and July 2015 (when Corel filed its complaint), Corel does not dispute CorelDRAW X6 and WordPerfect X6 practiced its patents, and it does not dispute these products were unmarked for at least some period of time.  Corel suggests (at 26) that it might have changed the packaging for these products in September 2013, but it gives the Court no evidence supporting this assertion.  The only images Corel provides (as Exhibits 91 and 92 to its opposition) are for later versions of the products (the X7 versions), not the X6 versions Microsoft raised in its motion.  The Court should reject Corel's unsupported attorney argument that it marked the X6 products.

Corel next criticizes Microsoft for showing sales of X6 products in just one year, 2016. Again, it is **Corel's** burden to give the Court evidence it complied with the marking requirement, and Corel gives no evidence it stopped selling X6 products between 2013 and 2016.  Also, Corel produced documents showing X6 products were available during this time period.  [*See* Ex. 32 at

COREL0051095; Ex. 33 at VECTOR0029675].   The Court should reject Corel's unsupported suggestion it did not sell X6 products between 2013 and 2016.

Finally, Corel relies on the *de minimis* exception to marking.   Here again, it is ***Corel's*** burden to show this exception applies.   *See MacPike v. Am. Honda Motor Co*., No. 92-30094, 1993 U.S. Dist. LEXIS 18970, at *16 (N.D. Fla. Sep. 30, 1993).   To meet its burden, Corel should give the Court unit sales information for its products, so the Court can determine whether the unmarked sales were in fact *de minimis*.   *See TecSec, Inc. v. Adobe Inc*., No. 1:10-cv-115, 2019 U.S. Dist. LEXIS 42997, at *7 (E.D. Va. Mar. 14, 2019).   Corel does not do so, and cannot do so because Corel never produced this information during fact discovery.   Based on the evidence Corel did produce, ███████████████████████████████████████████████ ████████████████████████████████████████████████████.   [*See* Ex. 32 at COREL0051095; Ex. 33 at VECTOR0029675].   Because Corel fails to show substantial compliance with the marking statute, summary judgment is appropriate.   *See TecSec,* 2019 U.S. Dist. LEXIS 42997, at *7.

### F.   Corel Should Not Be Permitted to Seek Damages for Foreign Sales

The only infringing act Corel says Microsoft engaged in within the United States was use of products during testing and development.   [Opp. at 28].   Given that theory, Corel must show how Microsoft's internal use increased the value of some foreign conduct.   *Brumfield, Tr. for Ascent Tr. v. IBG LLC*, 97 F.4th 854 (Fed. Cir. 2024).   Corel fails to give any evidence satisfying this test.   Corel makes the assertion that "Microsoft's U.S. testing created increased demand worldwide," but it gives no factual support for this statement.   No witness ever said Microsoft's use or testing in the U.S. increased the value of any foreign conduct, and no document shows any

causal link between the two. Lacking any evidence, Corel creates a strawman: it argues Microsoft knew the ***accused feature*** would increase the value of Microsoft products. That is not the test. Under *Brumfield*, Corel must show ***testing*** increased the value of some foreign activity. Corel has no evidence it did, making summary judgment appropriate.

Also, the bulk of the development and testing for Live Preview took place years before the '483 patent issued. Corel and its expert never address the separate requirement in *Brumfield* to show "a concrete, coherent account of why, in the hypothetical negotiation, the royalty for new domestic acts" (*i.e.*, acts taking place after the patent issued in 2010) "would have properly been increased." *Id*. at 881. In other words, even assuming Microsoft tested later versions of its products, Corel does not show how that later testing (the incremental testing from 2010 forward) increased the value of any foreign activity, or by what amount. Summary judgment is appropriate for this separate, independent reason. Finally, exclusion is appropriate since Corel and its expert did not apply the proper legal test.

### G. Corel's Three Damages Theories Should Be Excluded

Corel argues (at 31) that Mr. Weinstein used a "hypothetical negotiation" approach for determining damages. A "hypothetical negotiation" attempts to determine what the parties would have agreed to in a business negotiation, but Mr. Weinstein has no evidence Microsoft or Corel ever used anything like the "Office 2007 Value Model" or the "Forrester Model" to value intellectual property. [Ex. 20 at 21:21-22:16, 76:19-77:5, 93:17-22]. Indeed, Corel and its expert have no evidence anyone has ever used such models or similar models to value intellectual property. The Court should give extra scrutiny to these untested models. *See Mike's*

*Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407-08 (6th Cir. 2006); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846, 2012 U.S. Dist. LEXIS 90877, at *29 (N.D. Cal. Jun. 29, 2012).

### 1.    The Office 2007 Model Is Unreliable and Should be Excluded

All the calculations Mr. Weinstein performed in his "Office 2007 Value Model" are based on a single document.  Corel argues Mr. Weinstein considered other documents, but it never responds to the fact that other documents were not the basis of and are inconsistent with Mr. Weinstein's model.  For example, Mr. Weinstein acknowledged that while he only identified four features in his chosen document (and thus adopted an apportionment of ¼), other similar documents identified 12 features (which would have resulted in an apportionment of 1/12, since he valued each feature equally).  [Ex. 17, ¶ 133 & n.216; *id.*, p.63, n.246; Ex. 20 at 55:20-23, 56:7-57:19].  Corel also does not address the fact that Mr. Weinstein's chosen document actually lists five "investments," not four, so his ¼ apportionment is incorrect (it should have been at least 1/5).  [*See* Ex. 21 at MS_COREL_003601199 & -217-28].  Corel also ignores that Mr. Weinstein's chosen document discusses features he did not attempt to account for, such as the Open XML File Format.  [Ex. 20 at 29:12-31:2].  Corel argues it was enough for Mr. Weinstein to acknowledge the existence of these inconsistent documents, but the Court must evaluate the sufficiency of Mr. Weinstein's apportionment.  *See VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014).  His failure to properly apportion based on available evidence means the Court must exclude his theory.

Corel relies on *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1312-13 (Fed. Cir. 2018), but there is no indication that the expert in *Finjan* ignored unpatented features in the document she relied on, there is no indication she miscounted the number of features in her

15

chosen document, and there is no indication she failed to address other, similar documents showing differing numbers of features. Relying on one document might be acceptable if it is the only available document, and if the expert accurately accounts for its contents, but that was not the case here.

As to whether various features in Office 2007 should be given equal value, Corel says its expert relied on documents regarding the importance of Live Preview, but that is inconsistent with Mr. Weinstein's testimony. Mr. Weinstein said he gave the features equal value because the document he relied on "lay[s] them out equally" and "doesn't attribute more value to one or the other." [Ex. 20 at 24:20-25:10, 34:6-10]. That is insufficient. Again, *Finjan* is distinguishable. The expert in *Finjan* apparently knew how many features were in the product. Here, Mr. Weinstein admitted he had no idea how many features were in Office 2007, or whether they actually had equal value. [*Id*. at 68:15-20].

As for whether Mr. Weinstein had to apportion for accused <u>font</u> features, Corel argues no apportionment was necessary because font previews are "important to the user's experience," "drive demand for … Live Preview," and "substantially create the value for Live Preview," but Corel gives no case that says such assertions avoid the need to apportion. There is only one circumstance where a plaintiff can avoid apportioning: when its patent is the sole basis for demand for the entire product. Corel does not argue that narrow exception applies here, so its expert had to apportion. His failure to do so warrants exclusion. *See VirnetX,* 767 F.3d at 1329.

Finally, Corel argues it was proper for its expert to average the prices for Office 2007 upgrades because "Microsoft sold infringing products at different prices." This is a non sequitur. The difference between Office Home and Office Professional has nothing to do with Live

Preview—both versions included it.  That price difference is attributable to the presence of unaccused features and products, including Microsoft Access and OneNote, but Mr. Weinstein did nothing to attempt to remove the value for those features and products when he included them in his model.  [Ex. 20 at 70:17-71:11].  This lack of apportionment warrants exclusion.  *See VirnetX*, 767 F.3d at 1329.

### 2.  The Forrester Model is Unreliable and Should be Excluded

Mr. Weinstein's Forrester Model relies on a document that analyzes alleged productivity benefits a hypothetical Microsoft *customer* would realize when upgrading to Office 2010.  [Ex. 22 at MS_COREL_00365913].  Corel's opposition argues (at 39) that the model determined incremental value to *Microsoft*, but it does not explain how.  It is impossible for the model to bear on value to Microsoft, since the Forrester study never analyzes Microsoft.  Corel also argues (at 40) that "Mr. Weinstein does not rely on the Forrester study's specific cost-savings calculations," but he clearly does: they are the sole basis for his 7.03% royalty rate.  [Ex. 18 at Exhibit 11, line 4].  Corel provides neither case law nor facts that support taking the leap from customer productivity to Microsoft revenue or profitability.  Corel also ignores that the productivity gains in the Forrester study were for a *hypothetical* customer.  It does not show any actual customer achieved those gains.  Corel fails to respond to the statement in the study that it should not be used to draw conclusions about actual customers.  [Ex. 22 at MS_COREL_00365932].

Corel also argues it was proper for its expert to value features in Office 2010 equally because Paste Preview was "fundamentally important."  Here again, Corel ignores Mr. Weinstein's testimony.  Mr. Weinstein said he gave the features equal value based solely on the

Forrester study itself—but that study says it was not attempting to value features.  [Ex. 20 at 82:21-84:7; Ex. 22 at MS_COREL_00365926].[6]  He thus has no valid support for his relative valuation.

Finally, Corel argues (at 39) that its Forrester Model was based on "the price that Microsoft charged for [the] upgrade" from Office 2007 to Office 2010, but this is wrong. Corel's model used the full price for Office 2010, not upgrade prices.  [Ex. 20 at 93:23-94:4]. Corel acknowledges later in its brief (at 41) that Microsoft "did not offer separate upgrade pricing" for Office 2010.  Corel appears to believe this lack of upgrade pricing excuses it from having to apportion, but it identifies no case law supporting that position.  It is contrary to decades of precedent stating that a patentee "must in **every case** give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features."  *See VirnetX*, 767 F.3d at 1326 (citing *Garretson v Clark*, 111 U.S. 120, 121 (1884), emphasis added).  That Microsoft did not do Corel's apportionment for it is no excuse; Corel's lack of apportionment warrants exclusion.

### 3.    The Lucent Model is Unreliable and Should be Excluded

Corel argues it established "baseline comparability" between the Lucent license and the '483 patent based on analysis by its technical expert, Dr. Bederson, but this ignores Dr. Bederson's testimony that one of skill in the art would not consider "form entry" (the technology at issue in the Lucent patent) to be a type of previewing.  [Ex. 16 at 146:5-147:16].  Mr. Weinstein also agreed form entry is not the same as previewing.  [Ex. 20 at 102:17-20].  Because both experts disavowed comparability, the Lucent theory should be excluded.

---

[6] Corel says there are no unaccused paste preview functionalities, but it never explains how it can accuse previews where no font changes occur, such as previewing pasting plain text.

18

Corel also argues there was no reason for its expert to adjust the Lucent settlement to remove prejudgment interest because the interest award is found in the *Lucent* judgment, not the Lucent settlement.  Yet the 109.5 million units Mr. Weinstein used to calculate his running royalty also came from the *Lucent* judgment, not the Lucent settlement.  [*See* Ex. 17, ¶ 50].  If it is appropriate to use the units in the judgment to understand the license, it should also be appropriate to account for the amount of interest in the judgment.  Alternatively, if the experts are limited to the four corners of the license, Mr. Weinstein has no basis for converting its lump sum into a running royalty.[7]

Corel next argues (at 44) that it was reasonable for its expert to rely on usage data for font changes generally because Live Preview is enabled by default.  Even if Live Preview is enabled by default, that does not mean everyone who changes fonts uses Live Preview.  [Ex. 20 at 107:5-18].  This argument also ignores that Microsoft produced usage data for Live Preview.  Mr. Weinstein used that usage data in other places (*see* Ex. 17, ¶ 195), but gave no reason why he relied on use of unaccused features for his calculations here.

Finally, Corel argues there was no need for Mr. Weinstein to perform a survey, but the survey showing 7% of customers would not have purchased Office without the accused functionality in *Lucent* was a required input for the damages calculation there.  [*See* Ex. 23 at MS_COREL_00541491].  If Mr. Weinstein performed the same calculation here using the same methodology, his damages would be zero because he has no proof anyone would not have purchased Office if it lacked Live Preview.

---

[7] The Federal Circuit recently granted *en banc* review in a case involving conversion of lump sum license agreements into running royalties.  *See EcoFactor, Inc. v. Google LLC*, Case No. 2023-1101, Dkt. 76 (Fed. Cir. Sep. 25, 2024).  The outcome may be relevant here.

## II.   RESPONSES TO COREL'S "ADDITIONAL MATERIAL FACTS"

- A.1: Not disputed, but irrelevant.

- A.2: Not disputed that in Photoshop 4 text is placed in a new image layer.  Disputed that text characters cannot be "individually selected, modified, or edited."  *See* Section A, above.

- A.3: Disputed.  There is no material difference between "text properties" and "layer properties" when the layer contains text.

- A.4: Not disputed, but irrelevant.

- A.5: Disputed.  The sliders in Photoshop 4 are labeled and indicate values.  [Ex. 1].

- A.6: Partially disputed.  To preview in Photoshop 4, a user had to "grab" a slider (*i.e.*, hover the cursor over it and hold down a mouse button), move the slider to a new location while still holding down the mouse button, and then hover (*i.e.*, pause the slider at a new location for a period of time).  [Ex. 1].

- A.7: Not disputed that previews occur in Photoshop 4 as the user moves the mouse horizontally, but horizontal mouse movement can include movement over the slider, and locations on the slider correspond to color values.  [Ex. 1].

- A.8: Disputed.  Photoshop 4 allows previewing changes for individual characters. *See* Section A, above.

- B.1-B.2: Not disputed.

- B.3-B.4: Disputed.  *See* Section B, above.

- C.1: Not disputed that the XF/XFE data structure in Excel stores certain font-related information, but that does not answer what in the XF/XFE is allegedly a "font command code."

- C.2: Corel's description of how Excel works is inaccurate, but those inaccuracies are not material to the outcome of this motion.

- D.1: Not disputed, but irrelevant. *See* Section D, above.

- E.1-E.3: Corel's cited evidence suggests it may have started virtually marking WordPerfect X7 and CorelDRAW X7 in September 2013, but those are not the products Microsoft raised in its motion.

- F.1-F.2: Not disputed, but irrelevant.

- F.3: Disputed. *See* Section F, above.

Dated:  December 16, 2024                    WHITE & CASE LLP

                                             By:  */s/ Jonathan J. Lamberson*
                                                  Jonathan J. Lamberson

                                             Attorneys for Defendant
                                             MICROSOFT CORPORATION

*Additional Counsel:*

Hallie Kiernan (hallie.kiernan@whitecase.com / *Pro Hac Vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY  10020-1095
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113

Frank E. Scherkenbach (scherkenbach@fr.com / *Pro Hac Vice*)
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02110
Telephone:  (617) 542-5070
Facsimile:   (617) 542-5071

Excylyn Hardin-Smith (hardin-smith@fr.com / *Pro Hac Vice*)
FISH & RICHARDSON P.C.
7 Times Square, 20th Floor
New York, NY 10036
Telephone: (212) 765-5070
Facsimile: (212) 258-2291

Attorneys for Defendant
MICROSOFT CORP.

## <u>D.U. CIV. L.R. 7-1(a)(3)(C) COMPLIANCE</u>

I hereby certify that this Motion contains 6,181 words (as measured by Microsoft Word) and therefore complies with the 6,200 word limit of DUCivR 7-1(a)(4)(B).


Dated: December 16, 2024                    WHITE & CASE LLP


                                            By: */s/ Jonathan J. Lamberson*
                                                Jonathan J. Lamberson

                                            Attorneys for Defendant
                                            MICROSOFT CORPORATION