# EXHIBIT 31

EXHIBIT 31

```
 1              UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF UTAH
 3
 4    COREL SOFTWARE,           )
 5         Plaintiff,           )
 6    vs.                       ) Civil No.
 7    MICROSOFT CORP.,          ) 2:15-cv-0528-JNP
 8         Defendant.           )
 9    _____
10
11
12
13         Deposition of BENJAMIN B. BEDERSON, Ph.D.
14              August 17, 2016 * 8:01 a.m.
15             101 South 200 East, Suite 700
16              Salt Lake City, Utah 84111
17
18             Reporter:  Ann Fleming, RPR
19      Notary Public in and for the State of Utah
20
21
22
23
24    JOB No. 2368678
25    PAGES 1 - 99
```

Page 1

**Page 78**

 1  something that is not persistent, it comes and goes.
 2     Q.   In paragraph 71, you say, "Therefore, in
 3  '483 Claim 1, the claimed Real Time Preview appears in
 4  the same area on the screen displaying the user's
 5  document."  Do you see that?
 6     A.   Yes, I do.
 7     Q.   And would a dialog window drawn in the
 8  same place on the user screen satisfy Claim 1 of the
 9  '483 patent?
10          MR. HARTING:  Object to form.
11          THE WITNESS:  So to answer your question,
12  I'd like to just make sure I understand the scenario
13  you're describing because there's a lot of details you
14  left out, just to make sure we're talking about the
15  same thing.  If we have a word processor with the
16  primary document display window and you've got the
17  document in that window, I think you're describing a
18  scenario where you have a popup modal dialog box on top
19  of that, so your question is, if you have something in
20  that popup modal dialog box that overlays the
21  underlying document, to the extent that that popup
22  dialog box overlaps some of that document, does that
23  meet, this appears in the same place requirement?
24     Q.   Yes.
25     A.   So, in that scenario, my answer is, no, it

**Page 79**

 1  does not because for multiple reasons, two general
 2  categories of my understanding come from the fact that
 3  the patent describes displaying the preview in the
 4  document display window and that popup modal dialog box
 5  probably isn't a document display window, and the
 6  second general reason is in the file history as I
 7  explained on paragraph 68 of my Declaration, the patent
 8  owners explicitly disclaimed transient small preview
 9  windows.
10          So popup dialog box I think would not meet
11  the requirement for being the same -- just generally
12  would not meet the requirements of the patent, which
13  includes the question you asked about being the same
14  place on the screen.
15     Q.   Let's take the Style Gallery in Word 97
16  for a moment, okay?
17     A.   Okay.
18     Q.   And that we said had a preview window that
19  showed the entire document, right?
20     A.   Generally, that's right.
21     Q.   And what if I made that window -- I drew
22  that window so that I modified the dialog box in Word
23  97 so that the boundaries of the preview document
24  exactly lined up with the boundaries of the document
25  displayed underneath, but you could still see all the

**Page 80**

 1  borders around it and the menus and everything else,
 2  would that be, quote-unquote, in the same area of the
 3  screen?
 4          MR. HARTING:  Object to form.
 5          THE WITNESS:  Just to be clear, we're
 6  talking about a hypothetical with some features that
 7  are not actually supported in Word 97?
 8     Q.   (By Mr. Lamberson) I'm not saying they're
 9  not supported; I'm just asking you if we modified in
10  the way that we described.
11     A.   Just to clarify, not if a user modified
12  the window because I don't think a user can modify that
13  window, but maybe if Microsoft made a new version of
14  the software that did something different, than it
15  currently does?
16     Q.   If they made it a little bit bigger, yes,
17  that's what I'm asking, would it be in the same place
18  on the screen if they just resized it to make it the
19  size of it correspond -- what I'm trying to figure out
20  here is you seem to be drawing a distinction between
21  what's the document and what's on top of the document,
22  but it seems like being on top of it isn't enough,
23  there's something else.
24     A.   Right.
25     Q.   So what's that something else?

**Page 81**

 1     A.   So I think that we're really referring --
 2  this discussion is all about the "updating the display"
 3  term, and I think Corel's construction most accurately
 4  describes what is the right understanding of that term,
 5  and that construction -- well, first of all, they know
 6  construction is necessary, but if one is necessary,
 7  then they say would be updating user's work area in
 8  accordance with the identified command.
 9          So when I wrote in paragraph 71 that "the
10  claimed Real Time Preview appears in the same place on
11  the screen displaying the user's document," I was
12  intending to communicate this idea of updating the
13  user's work area, which as I described elsewhere in my
14  Declaration, that this is updating the document display
15  window, which is on the same place on the screen.
16          So I think the real requirement of
17  updating the display of the portion of the document on
18  the display of the commuter in accordance with the
19  identified command, is that it is updating the document
20  display window, not some other transient small popup
21  window.
22     Q.   How about transient large popup window?
23  Could that be updating the display in the '483 patent?
24     A.   So I think my answer to this is, it
25  depends on the specific user interface and I'd have to

```
 1  understand whether that was reading on the claim that
 2  we're talking about, I would have to analyze the whole
 3  user interface.
 4      Q.  Let's go to paragraph 76.  You say, "A
 5  person of ordinary skill in the art would understand
 6  the term 'font command code,' as used in the '483
 7  patent, to mean 'code corresponding to setting a font
 8  attribute.'"  Do you see that?
 9      A.  Yes, I do.
10      Q.  When you say, "code corresponding to
11  setting a font attribute," are you referring to the
12  code in the program that actually makes the change?
13          MR. HARTING:  Object to form.
14          THE WITNESS:  So the reason I think this
15  is the right construction code corresponding to setting
16  a font attribute is precisely because it doesn't
17  specify exactly how you have to implement the setting
18  of the font attribute.  I think the patent gives a
19  range of technical approaches to setting font
20  attributes and I think that the patent specifically
21  disclaims any specific technology.  So the code, I
22  think, is not restricted to any specific kind of
23  implementation.
24      Q.  (By Mr. Lamberson) Could be any
25  implementation at all?  There's no limit on how you can
                                                  Page 82
```

```
 1  implement font command code in your view?
 2          MR. HARTING:  Object to form.
 3          THE WITNESS:  I think the font command
 4  code has to meet the overall requirements of the claim
 5  if you want to have a font command code that in a
 6  particular system that satisfies the requirements.
 7  But, as I said, I don't think -- I think that a range
 8  of technical limitations are certainly appropriate.
 9      Q.  (By Mr. Lamberson) I guess what I'm get
10  getting at, in some programs you might have a
11  particular data value that corresponds to a particular
12  font, so value 1 could be Times New Roman, value 2
13  could be Arial, et cetera, et cetera.  Do you
14  understand what I'm referring to?
15      A.  In general, yes.
16      Q.  And so that data value, could that be a
17  font command code in your opinion, the 1 or the 2?
18      A.  I think it depends how it is used, but
19  conceptually I think a font command code could be a
20  data element that's part of a data structure.
21      Q.  And then somewhere else in the program
22  there's going to be some code that when the user
23  changes from Times New Roman to Arial, there's going to
24  be code that says change value from 1 to 2, some source
25  code.  Could that source code itself also be a font
                                                  Page 83
```

```
 1  command code, or is it just the data value that's the
 2  font code?
 3      A.  I don't think there's any specific
 4  limitation on how to implement the font command code.
 5  I think it could include both data structures and code
 6  elements, which is consistent with the specification,
 7  which sometimes describes things that I think we're
 8  referring to as "data structures."  It also refers to
 9  pushing code onto the undo stack, which I think I read
10  as being executable code, so I think the patent
11  describes a range of uses of the term "code."
12      Q.  And what do you mean in paragraph 76 by
13  "font attribute"?
14      A.  I think that's a term that's pretty clear
15  to a person of skill in the art, simply means an
16  attribute of a font.  The patent talks about various
17  attributes of fonts such as font face, size and color;
18  those are all font attributes.
19      Q.  Are there any font attributes you think
20  are covered by Claim 1 of the '483 other than font
21  face, font size, font color?
22      A.  I haven't formed an opinion about all
23  possible user interfaces or systems that this could
24  apply to, so I don't have an exhaustive list of what
25  the range of font attributes could be.
                                                  Page 84
```

```
 1      Q.  Could you give me any examples of font
 2  attributes other than font face, font size and font
 3  color today?
 4      A.  None jump to mind.
 5      Q.  Are you familiar with how Corel
 6  WordPerfect stored font formatting information in a
 7  document?
 8          MR. HARTING:  Object to form.
 9          THE WITNESS:  I have not done a deep
10  technical analysis of WordPerfect, but I think I have a
11  high level understanding.
12      Q.  (By Mr. Lamberson) What's your high level
13  understanding?
14      A.  That there are data structures that are
15  placed within the text of the document that are used to
16  control how the text of the document is rendered much
17  like HTML does today.
18      Q.  Is there any particular term you'd use to
19  refer to that font formatting information in the text
20  of a document in WordPerfect?
21      A.  Again, I haven't done a technical
22  analysis.  I don't know if Corel engineers used any
23  particular term to describe that approach.
24      Q.  Have you ever heard of the Reveal Codes
25  functionality in WordPerfect?
                                                  Page 85
```

22 (Pages 82 - 85)

Page 86

1  A.  Yes, I have.
2  Q.  Have you ever used that functionality?
3  A.  Yes, I have.
4  Q.  Had you heard about it before this
5 litigation, Reveal Codes?
6  A.  Yes, I have.
7  Q.  Had you used it before this litigation,
8 you think?
9  A.  I don't recall if I have or have not.
10  Q.  You ever read that Reveal Codes is one
11 feature commonly associated with WordPerfect?
12      MR. HARTING:  Object to foundation.
13      THE WITNESS:  I have no way of knowing
14 whether it was common or not.
15  Q.  (By Mr. Lamberson) How did you hear about
16 it, Reveal Codes?
17  A.  I specifically recall last year having
18 someone in my neighborhood tell me that he used the
19 Reveal Codes feature of WordPerfect, so that's at least
20 one way I've heard about it.
21  Q.  Have you ever heard of the WordStar word
22 processor?
23  A.  I've heard the term.
24  Q.  Ever used it?
25  A.  I don't recall using it.

Page 87

1  Q.  Pretty famous word processor, right?
2  A.  I don't have any way of judging whether it
3 was famous or not.
4  Q.  Do you know how WordStar stored font
5 formatting information?
6  A.  No, I do not.
7      MR. LAMBERSON:  Let's take a short break.
8      (Break)
9  Q.  (By Mr. Lamberson) Let's look at paragraph
10 91 of your Declaration.  You refer to a portion of the
11 file history for the '483 patent.  Do you see that?
12  A.  Yes, I do.
13  Q.  Specifically a sentence that says, "By
14 allowing this type of preview the user can quickly see
15 the impact on the document without performing
16 additional sets," which you interpret to mean steps; is
17 that fair?
18  A.  That's part of the quote that I
19 referenced.
20  Q.  And you think it's important that the
21 Court consider this part of the file history, this
22 paragraph in construing this patent?
23  A.  I think all of the patents in its file
24 history should be considered but certainly including
25 this quote that I include.

Page 88

1  Q.  Well, is this the only place you're aware
2 of that this language "additional sets" appears in the
3 intrinsic record?
4  A.  There's a long intrinsic record.  I don't
5 know for sure whether or not it appears elsewhere.
6  Q.  Would you agree that you don't cite
7 anywhere else that uses this single step language --
8 or, sorry, additional step language?
9  A.  As I said, there's a lot of documentation.
10 I don't recall any other specific place in the record
11 that uses that term, and I don't recall if I cited it
12 elsewhere or not.
13  Q.  And you've added the italics that are in
14 this paragraph in 91, right?
15  A.  That's right, as I described in the
16 Declaration.
17  Q.  The next sentence then says, "The user can
18 then confirm the selection and a code corresponding to
19 the identified font code is inserted into the
20 document."  Do you see that?
21  A.  Yes, I do.
22  Q.  So that suggests that the font code in the
23 '483 patent is something that's inserted in the
24 document, right?
25  A.  Certainly suggests that's at least one way

Page 89

1 to implement this.
2  Q.  Well, so you're saying that even though
3 Corel said this year there could be other ways to
4 insert font command codes not into the document?
5      MR. HARTING:  Object to form.
6      THE WITNESS:  I think the actual
7 requirement of the claim is, quote, "inserting the font
8 command code corresponding to the identified font into
9 the memory medium storing the active document," which
10 is different than I think the way you just described it
11 as inserting the font command code into the document.
12  Q.  Right.  But even though Corel said, here
13 in this portion of the file history, the code is
14 inserted into the document, you interpret the claims to
15 also cover other ways of inserting font command codes,
16 true?
17  A.  As I said, I don't think the claims should
18 limit font command codes to one specific technical
19 implementation.
20  Q.  You do think, though, that the claims
21 should be limited to only previewing with a single
22 step, right?
23  A.  Just to be clear, the construction that we
24 referred to of using a single step was referring to the
25 identifying but not executing term of the '996 patent,

23 (Pages 86 - 89)

## Page 90

1  and now we're talking about the '483 patent where the
2  relevant term is without confirmation being received
3  from the user.
4      Q.   And there your proposal is, without
5  receiving an indication, that the user has performed
6  the subsequent step required to confirm the identified
7  font; is that right?
8      A.   That's correct.
9      Q.   Could a user perform multiple steps to
10 preview in the '483 patent so long as the last step is
11 -- so long as none of them were a confirmation step, in
12 your opinion?
13     A.   So looking at the '483 patent Claim 1,
14 there are a number of limitations, all of which would
15 have to be satisfied for this claim to apply, but I
16 think the thing that we're talking about, the core user
17 activity is to include identifying a font by hovering
18 of the cursor for a predetermined period of time over
19 the font.  There are a number of other characteristics
20 followed by updating the display of the active document
21 in the document display window to show the impact of
22 the inserted font command code on the display of text
23 of the active document without confirmation being
24 received from the user.
25         So I think the two relevant pieces that we

## Page 91

1  just talked about is identifying a font by hovering and
2  without confirmation being received from the user.
3      Q.   Right.
4      A.   In general, my understanding is that in
5  practice, a claim of a patent, by doing additional
6  elements, as long as you at least do these elements, so
7  I think what the key thing that you're asking is, could
8  there be some other steps if the user steps, after
9  identifying a font by hovering, but without
10 confirmation being received from the user.
11         So as I just said in general, additional
12 steps are typically allowed as long as all of the
13 requirements of the claim are met.  So at least
14 conceptually, it might be possible for there to be some
15 additional user action if it didn't include
16 confirmation, but, again, it would have to depend on
17 any specific, any actual analysis would have to depend
18 on the specific interface.
19     Q.   Do you agree that in the '483 patent you
20 can't identify a font by hovering of the cursor without
21 first knowing where the cursor is?
22     A.   I think if you're going to identify a font
23 by hovering of the cursor, at least part of the system
24 needs to know where the cursor is.
25     Q.   Paragraph 150 of your Declaration, you

## Page 92

1  say, "Instruction is a well-known phrase in the art
2  connoting structure," right?
3      A.   Yes.
4      Q.   Would you agree that all software programs
5  ever written are made up of some number of
6  instructions?
7      A.   I hesitate to say that, to make such a
8  broad statement, maybe there are some systems that I'm
9  not aware of or haven't thought of that somehow
10 communicate to a computer to execute activity with
11 something that I wouldn't consider instruction.  I
12 can't think of any, but I not going to say that there
13 never could be such a thing.
14     Q.   Let me phrase it this way.  Is there any
15 software that you're aware of sitting here today that
16 was made up of some number of instructions?
17     A.   No.  In fact, as I said here in paragraph
18 150-A, quote, "I understand 'instructions' to be one of
19 the core building blocks of a commuter software
20 program."
21     Q.   Can you tell me roughly how many times
22 you've served as an expert in patent cases?
23     A.   Approximately two dozen.
24     Q.   Do you have any sense of what percentage
25 of those roughly were on behalf of plaintiffs in patent

## Page 93

1  cases, or patentholders I should say?
2      A.   I'm not sure exactly but somewhere in the
3  order of a quarter.
4      Q.   And the rest then were for accused
5  infringers?
6      A.   Correct, a very rough approximation.
7      Q.   Sure.  How many times have you worked as
8  an expert for the Robins Kaplan firm before this case?
9      A.   I think I worked with them for one other
10 case.
11     Q.   What case was that?  What was the name?
12     A.   I'm not sure if I was ever disclosed as an
13 expert in that case, so I don't think I can say.
14     Q.   How many hours did you spend preparing the
15 Declaration that you submitted in this case?
16     A.   I did not look at a summary, so I don't
17 recall.
18     Q.   Do you know how many hours you billed
19 total for this matter?
20     A.   No, I do not.
21     Q.   Do you have any order of magnitude or
22 estimate of how much money you've received from Corel
23 to date for your expert services?
24     A.   So order of magnitude, so within a factor
25 of ten?