# **<u>EXHIBIT 1</u>**

Includes Confidential Information – Attorneys Eyes Only

WHITE & CASE

# Microsoft's Summary Judgment Motions

*Corel Software LLC v. Microsoft Corp.*,
**Case No. 2:15-cv-00528-JNP-DBP**

September 9, 2025

# Microsoft's Motions

- ☐ Invalidity (Obviousness)

- ☐ Non-Infringement

  - – Claim 1 and Dependent Claims

  - – Accused Excel Products

- ☐ Pre-suit Damages

- ☐ Damages for Foreign Sales

- ☐ Quasi-Estoppel

WHITE & CASE

# Microsoft's Motions

☐ **Invalidity (Obviousness)**

☐ Non-Infringement

–  Claim 1 and Dependent Claims

–  Accused Excel Products

☐ Pre-suit Damages

☐ Damages for Foreign Sales

☐ Quasi-Estoppel

WHITE & CASE

# What Corel Says It Invented



The invention is broadly defined as a method of providing real time preview of commands in a computer system having means for displaying commands on a display screen, comprising the step of responding to one of the commands being identified by executing computer code corresponding to the identified command. The primary distinction between this method and that of the prior art is that commands need only be identified by the User, and the identified command will be executed on the active document and the menu left open. Generally in the prior art, a command must be selected and then executed by the User, before the menu will be closed and the document will be updated.

Because the invention executes the identified command on the entire active document when it is identified, the User is able to see the full impact of the command on the document. Because the menu has been left open, the User has the option of selecting a new command which will replace the identified command, confirming that the identified command is desired, or cancelling the identified command.

'483
Patent,
3:15-35

# What Corel Says It Invented

3.    In the late 1990s, engineers working at Corel's facility in Orem, Utah invented a feature for WordPerfect called "RealTime Preview."  This marked a significant advance in ease-of-use by allowing users to preview the outcome of formatting changes quickly and without the burdensome, "trial-and-error" process of committing to a change, then having to "undo" the change if it did not satisfy the user's needs, and repeating the process until the user was satisfied.

Dkt. 2 (Complaint)

# Photoshop 4 Previewed In The Document With The Menu Open



Dkt. 378, Ex. 1

6

# No Dispute Photoshop 4 is Prior Art



Ex. 2





'483 patent

# No Dispute Most Limitations are Met

1. A method of providing a real time preview of changes to fonts in a computer system operating a document editing program having a document display window, comprising:

    storing an active document in a memory medium;

    displaying at least part of the active document in the document display window including text having an associated font command code, the document display window for editing the active document therein;

    tracking a cursor position controlled by a user in the document editing program;

    identifying a font by hovering of the cursor for a predetermined period of time over the font displayed in a menu or toolbar option of the document display window, the menu or toolbar option providing one or more available fonts, each of the available fonts associated with a respective font command codes that can be applied to the active document;

    inserting the font command code corresponding to the identified font into the memory medium storing the active document and

    updating the display of the active document in the document display windows to show the impact of the inserted font command code on the display of the text of the active document, without confirmation being received from the user;

    pushing the font command code corresponding to the identified font to the undo stack when a subsequent confirmation is received from the user; and

    removing the font command code corresponding to the identified font from the memory medium when subsequent confirmation is not received from the user or when another font command code is identified.

- Photoshop graphics are "documents"
- Documents are stored in memory
- Documents are displayed
- Mouse is tracked
- Documents can be edited and the display is updated
- Changes can be undone

**WHITE & CASE**

8

# Only Two Disputes

☐ Whether Photoshop 4 had "fonts" with "font command codes"

☐ Whether Photoshop 4 identified a font by hovering the cursor for a predetermined period of time over the font displayed in a menu or toolbar option of the document display window

# "Fonts" And "Font Command Codes"

> Accordingly, the court rejects Microsoft's proposed construction of "font" and accepts Corel's proposal that the term be given its plain and ordinary meaning.[4]

> [4] This construction, of course, begs the question of what the plain and ordinary meaning of "font" would be to a person of ordinary skill in the art at the time the invention was made. Corel argues in the alternative that, "to the extent a construction will aid the jury," this term means "a set of attributes for text characters." At this juncture, Corel's proposed alternate construction is premature. If Corel or Microsoft believes that the jury should receive a clarifying instruction for this term, it may propose the instruction at the appropriate time.

Dkt. 361 (2/12/2024 Claim Construction Order)

WHITE & CASE

10

# Corel Reads "Fonts" Broadly

352.    As I indicated in my prior Declarations, a POSITA would understand that a "font" refers to a set of attributes for text characters. *See* Dkt 321-1, ¶ 5; Dkt. 333-1, ¶ 22. Accordingly, each of the Accused Live Preview Font Commands would comprise a "font" because they change an aspect of text like font face, font size, font color, or highlighting. Dkt. 333-1, ¶¶ 23-

THE WITNESS:  So I think the '483 patent            14:15:09
itself makes it quite clear that font command codes   14:15:12
are intended to be understood as a broad term.  So,   14:15:16

* * *

So I don't think that the patent was                14:16:04
considering font command code to have strong, specific   14:16:09
requirements.                                        14:16:17

Ex. 14 (Bederson Infringement Report) (top); Ex. 16 (Bederson Dep. Tr.) at 88:1-14 (bottom)

WHITE & CASE

11

# Photoshop 4 Has "Fonts" With "Font Command Codes"




Dkt. 378, Ex. 1

# Corel Argues Photoshop Fonts "Cannot Be Edited"

> Photoshop 4 includes a Type Tool allowing a user to add bitmapped type. Ex. 85, ¶111. Once text is converted to bitmapped type, the text and its properties cannot be edited. *Id*. At that point, the text is simply a single image like any other layer in Photoshop 4. *Id*., ¶¶111, 167, 233; Ex. 95 at 30:21-31:1. Bitmapped type cannot be individually selected, modified, or edited as text. Ex. 85, ¶¶111, 167, 233; Ex. 95 at 30:21-31:1. This is illustrated by a video submitted with the Declaration of Dr. Bederson showing how a user cannot select the individual text once added as an image. Bederson Decl., ¶9, Ex. 1.

Dkt. 404 (Corel Opp.)

# Photoshop Fonts Can Be Edited




Dkt. 378, Ex. 1

# Corel Argues Photoshop Text Cannot Be Individually Selected/Modified/Edited

Photoshop 4 includes a Type Tool allowing a user to add bitmapped type. Ex. 85, ¶111. Once text is converted to bitmapped type, the text and its properties cannot be edited. *Id*. At that point, the text is simply a single image like any other layer in Photoshop 4. *Id*., ¶¶111, 167, 233; Ex. 95 at 30:21-31:1. Bitmapped type cannot be individually selected, modified, or edited as text. Ex. 85, ¶¶111, 167, 233; Ex. 95 at 30:21-31:1. This is illustrated by a video submitted with the Declaration of Dr. Bederson showing how a user cannot select the individual text once added as an image. Bederson Decl., ¶9, Ex. 1.

Dkt. 404 (Corel Opp.)

# The Independent Claims Do Not Require "Selecting" Text

1. A method of providing a real time preview of changes to fonts in a computer system operating a document editing program having a document display window, comprising:

storing an active document in a memory medium;

displaying at least part of the active document in the document display window including text having an associated font command code, the document display window for editing the active document therein;

tracking a cursor position controlled by a user in the document editing program;

identifying a font by hovering of the cursor for a predetermined period of time over the font displayed in a menu or toolbar option of the document display window, the menu or toolbar option providing one or more available fonts, each of the available fonts associated with a respective font command codes that can be applied to the active document;

inserting the font command code corresponding to the identified font into the memory medium storing the active document and

updating the display of the active document in the document display windows to show the impact of the inserted font command code on the display of the text of the active document, without confirmation being received from the user;

pushing the font command code corresponding to the identified font to the undo stack when a subsequent confirmation is received from the user; and

removing the font command code corresponding to the identified font from the memory medium when subsequent confirmation is not received from the user or when another font command code is identified.

# In Any Event, Photoshop Could Edit Individual Characters if Desired



Dkt. 411

# Corel's Arguments are Inconsistent With its Infringement Positions

Appendix D to Expert Report of Benjamin B. Bederson

Accused Live Preview Font Commands

**Microsoft Word**

| Command | Versions | '483 Patent Claims |
|---|---|---|
| Text: | | |
| 1.  font face | All | 1, 2, 6, 7, 14 |
| 2.  font size | All | 1, 3, 6, 7, 14 |
| 3.  font color | All | 1, 4, 6, 7, 14 |
| 4.  text styles | All | 1, 2, 3, 4, 6, 7, 14 |
| 5.  text highlight | All | 1, 6, 7, 14 |
| 6.  text effects | 2010, 2013, 2016, 2019 | 1, 2, 3, 4, 6, 7, 14 |
| 7.  insert drop cap | 2013, 2016, 2019 | 1, 3, 6, 7, 14 |
| Page: | | |
| 1.  theme colors | All | 1, 4, 6, 7, 14 |
| 2.  theme | All | 1, 2, 4, 6, 7, 14 |
| 3.  fonts | All | 1, 2, 6, 7, 14 |
| 4.  document formatting | 2013, 2016, 2019 | 1, 2, 3, 4, 6, 7, 14 |
| Table: | | |
| 1.  table styles | All | 1, 2, 4, 6, 7, 14 |
| Text Box: | | |
| 1.  Text Box styles | 2007 | 1, 4, 6, 7, 14 |
| 2.  shape fill | All | 1, 4, 6, 7, 14 |
| 3.  shape styles | 2010, 2013, 2016, 2019 | 1, 4, 6, 7, 14 |
| 4.  WordArt styles | 2010, 2013, 2016, 2019 | 1, 4, 6, 7, 14 |

Appendix D to Expert Report of Benjamin B. Bederson

Accused Live Preview Font Commands

| Command | Versions | '483 Patent Claims |
|---|---|---|
| WordArt: | | |
| 1.  WordArt styles | All | 1, 4, 6, 7, 14 |
| 2.  text fill | 2010, 2013, 2016, 2019 | 1, 4, 6, 7, 14 |
| 3.  text outline | 2010, 2013, 2016, 2019 | 1, 4, 6, 7, 14 |
| 4.  text effects | 2010, 2013, 2016, 2019 | 1, 4, 6, 7, 14 |
| SmartArt: | | |
| 1.  layouts | All | 1, 3, 4, 6, 7, 14 |
| 2.  SmartArt styles | All | 1, 4, 6, 7, 14 |
| 3.  change color | All | 1, 4, 6, 7, 14 |
| 4.  shape styles | All | 1, 4, 6, 7, 14 |
| 5.  WordArt styles | All | 1, 4, 6, 7, 14 |
| 6.  text fill | All | 1, 4, 6, 7, 14 |
| 7.  text outline | All | 1, 4, 6, 7, 14 |
| 8.  text effects | All | 1, 4, 6, 7, 14 |
| Chart: | | |
| 1.  shape styles | All | 1, 4, 6, 7, 14 |
| 2.  WordArt styles | All | 1, 4, 6, 7, 14 |
| 3.  text fill | All | 1, 4, 6, 7, 14 |
| 4.  text outline | All | 1, 4, 6, 7, 14 |
| 5.  text effects | All | 1, 4, 6, 7, 14 |
| Paste | 2010, 2013, 2016, 2019 | 1, 2, 3, 4, 6, 7, 14 |

Dkt. 387-3 (Bederson Report)

Shape Fill

Shape Fill

Shape Fill

18

# Fonts and Font Command Codes Were Well Known in the Art and Obvious

It is not the intent of the invention to alter how codes are stored in a document. The invention may be implemented in existing application programs by using the existing subroutines to insert code, identify matching codes and replace them. Such programs may also execute steps **48** and **50** in a different order, in less clearly defined steps, or by storing code in different parts of the active document. The User may have a default text font and font size stored in a document header, and only alter the code in part of the document. The manner in which a given application program would implement such steps would be known in the art.

'483 Patent, 7:52-62

# What Corel Says It Invented



Either of these methods may be easily implemented by one skilled in the art, because generally speaking, no new software routines are required. The method of the invention consists generally of the same routines as known in the art, but executed in a different order. The task of implementing the invention is therefore one of re-arranging existing routines to execute in the new order, and verifying and modifying if necessary the routines to maintain the coordination of variable declarations, assignments and calls.

'483 Patent,
6:4-12

# Dispute 2: Whether Photoshop 4 Could Preview Font Changes While Hovering

identifying a font by hovering of the cursor for a predetermined period of time over the font displayed in a menu or toolbar option of the document display window, the menu or toolbar option providing one or more available fonts, each of the available fonts associated with a respective font command codes that can be applied to the active document;

WHITE & CASE

21

# Photoshop Identifies Font by Hovering





Ex. 1

□ Step 1: Position Mouse Over Slider

□ Step 2: Hold Down Mouse Button (Corel calls this "selecting")

□ Step 3: Move slider to new location/value (Corel calls this "dragging")

□ **Step 4: Pause at the new location/value for 1/3 second**

  ➤ **This is hovering**

# It is Legally Irrelevant if Other Steps Are Performed Before Hovering

1. A method of providing a real time preview of changes to fonts in a computer system operating a document editing program having a document display window, comprising:
   storing an active document in a memory medium;
   displaying at least part of the active document in the document display window including text having an associated font command code, the document display window for editing the active document therein;
   tracking a cursor position controlled by a user in the document editing program;
   identifying a font by hovering of the cursor for a predetermined period of time over the font displayed in a menu or toolbar option of the document display window, the menu or toolbar option providing one or more available fonts, each of the available fonts associated with a respective font command codes that can be applied to the active document;

"The transition 'comprising' in a method claim indicates that the claim is open-ended and allows for additional steps.  Claim 1 uses the open-ended transition 'comprising' to introduce the recited steps. Thus the claim signals to patent practitioners that claim 1 allows activity…before the recited steps."

*Invitrogen Corp. v. Biocrest Mfg*., L.P., 327 F.3d 1364, 1368 (Fed. Cir. 2003)

# Hovering and Clicking are Not Mutually Exclusive

At step **68**, a guideline or margin is grabbed by the User double-clicking or clicking and holding, with a mouse cursor hovering over a menu or toolbar option. Other ways as known in the art may also be used, in one of the manners described above, or by identifying the margin or guideline in a ruler bar.

'483 Patent, 10:7-11

# Corel Argues Photoshop Controls Are Not In the Document Display Window

**Second**, Dr. Bederson explained how the alleged Adobe Photoshop 4 preview functionality is accessible only through controls from a separate dialog box. Ex. 85, ¶¶209-214; Ex. 95 at 34:17-25. Dr. Bederson therefore explained how the asserted Adobe Photoshop 4 commands were not in "a menu or toolbar option **of the document display window**." Ex. 85, ¶209-215 (emphasis added).

Dkt. 404 (Corel Opp.)

# The Patent Says Commands Can Be Chosen From a Dialog Box

At step **40**, a command is identified by a cursor hovering over a menu or toolbar option. As described above, commands may be presented by the application program in a number of manners including pull down menus and dialogue boxes. The User may select from the menus using a mouse,

At step **10** the software application program notes that a menu or toolbar option has been identified. As described above, available commands may be presented and selected from menus and toolbars which may be set up as pull down menus, dropdown controls, toolbar combo-boxes, toolbar grid-pickers and dialogue boxes. Other implementations would also be known to one skilled in the art.

'483 Patent,
3:63-4:2;
6:45-49

# Corel is Being Inconsistent



408.    As depicted by the screenshot provided below, Microsoft's Word 2013 identifies a font (indicated below by the highlighted font face) by hovering of the cursor for a predetermined period of time over the font displayed in a menu or toolbar option of the document display window. In particular, hovering of the cursor for an extended period of time over the "Arial Black" font face formatting option within the font face drop down menu results in the "Arial Black" font face being highlighted, activating Microsoft Word 2013's Live Preview feature.

Ex. 14, p.111 (Bederson Report, blue highlights added)

# Corel is Being Inconsistent



Ex. 14, p.116
(Bederson Report)

WHITE & CASE

# Corel is Being Inconsistent



Ex. 13, pp.77, 80
(Bederson Validity Report)

**WHITE & CASE**

# Corel Argues the Mouse Does Not Hover Over the Font

> **Third**, Dr. Bederson explained how the alleged Adobe Photoshop 4 preview
>
> functionality and adjustment of the slider is based simply on horizontal mouse movement, not
>
> "identifying a font by hovering of the cursor . . . **over the font**," as illustrated in a video exhibit.
>
> Ex. 85, ¶217; Bederson Decl., ¶14, Ex. 6.

Dkt. 404 (Corel Opp.)

WHITE & CASE

30

# Horizontal Movement is How You Identify a Different Font Color Value



Dkt. 411

# Again, Corel is Being Inconsistent



Ex. 14, p.116 (Bederson report, red arrow added)

# Again, Corel is Being Inconsistent



Dkt. 333-24 (Bederson Decl.) (red arrow added)

# Claim 14 is the Same as Claim 1 for Obviousness Purposes

**14**. A computer readable memory providing instructions for executing a method of providing a real time preview of changes to fonts in a computer system operating a document editing program having a document display window, the instructions comprising: 5

    storing an active document in the computer readable memory;

    displaying at least part of the active document in the document display window including text having an associated font command code, the document display window for editing the active document therein; 10

    tracking a cursor position controlled by a user in the document editing program;

    identifying a font by hovering of the cursor for a predetermined period of time over the font displayed in a menu or toolbar option of the document display window, the menu or toolbar option providing one or more available 15

fonts, each of the available fonts associated with a respective font command codes that can be applied to the active document;

    inserting the font command code corresponding to the identified font into the memory medium storing the active document, and;

    updating the display of the active document in the document display window to show the impact of the inserted font on the display of the text of the active document, without confirmation being received from the user;

    pushing the font command code corresponding to the identified font to the undo stack when a subsequent confirmation is received from the user; and

    removing the font command code corresponding to the font from the memory medium when subsequent confirmation is not received from the user or when another font command code is identified.

        *   *   *   *   *

# The Dependent Claims are Obvious

**2.** The method of claim **1** wherein the font comprises a font face.

**3.** The method of claim **1** wherein the font comprises a font size.

**4.** The method of claim **1** wherein the font comprises a font color.

Either of these methods may be easily implemented by one skilled in the art, because generally speaking, no new software routines are required. The method of the invention consists generally of the same routines as known in the art, but executed in a different order. The task of implementing the invention is therefore one of re-arranging existing routines to execute in the new order, and verifying and modifying if necessary the routines to maintain the coordination of variable declarations, assignments and calls.

FIG. **2** presents a flowchart of a computer software routine for performing such a real time preview of text editing commands in an embodiment of the invention. This method can typically be incorporated into a standard text editing application program, by altering the order of the existing software subroutines.

'483 Patent, 6:4-12, 39-44

# The Dependent Claims are Obvious

> In rejecting claims 74-80 as obvious, the Examiner made reference to page 8 lines 16-19 of the specification, alleging that the Applicants have conceded the claimed invention to be prior art. The Applicants respectfully submit that the Examiner has misread the specification. To paraphrase this section of the text, the invention can be made using standard, pre-existing subroutines. It is still necessary though, to "re-arrange" the subroutines (as noted in line 20 of page 8) to effect the essence of the invention. That is, the subroutines are re-arranged to *execute commands in response to the commands being identified*, rather than in response to a positive indication to execute (such as by clicking on an "OK" button, "Add" button, "Change" button, or the like). This limitation is clear in claim 74, for example, which reads: "means for responding to

Dkt. 322-05, JA-00256 (6/30/2003 Office Action Response)

WHITE & CASE

36

# The Dependent Claims are Obvious

6. The method of claim 1 wherein pushing the font command code corresponding to the font to the undo stack when the subsequent confirmation is received by the user, further comprises closing the menu or toolbar option.





Ex. 1

Before

After

# The Dependent Claims are Obvious

**7.** The method of claim **1** further comprising selecting desired text to change within the active document before responding to the identified font.



Dkt. 411

WHITE & CASE

# The Dependent Claims are Obvious

**11.** The method of claim **1** wherein the document editing program is a spreadsheet program.

This method may be applied to a large variety of implementations. Examples described below include text editors, margin or guidelines, and graphic editors. It would be clear to one skilled in the art however, how to apply the invention to other software applications, such as spreadsheets and database management programs.

'483 Patent, 6:13-18

# Microsoft's Motions

- Invalidity (Obviousness)
- Non-Infringement
  - Claim 1 and Dependent Claims
  - Accused Excel Products
- Pre-suit Damages
- Damages for Foreign Sales
- Quasi-Estoppel

WHITE & CASE

# To Infringe a Method Claim Each Step Must Be Performed

To establish liability for direct infringement of a claimed method or process under 35 U.S.C. § 271(a), a patentee must prove that **each and every step of the method or process was performed**.

*Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech*., 709 F.3d 1348, 1362 (Fed. Cir. 2013)

WHITE & CASE

41

# Method Claim 1 of the '483 Patent

> **pushing the font command** code corresponding to the identified font to the undo stack when a subsequent confirmation is received from the user; and
> **removing the font command code** corresponding to the identified font from the memory medium when subsequent confirmation is not received from the user or when another font command code is identified.

☐ The Court's claim construction order (Dkt. 361) did not require that these steps be performed in order

WHITE & CASE

42

# Corel Accuses Three Scenarios for "Removing"

477.    In Microsoft Word 2013 Live Preview, subsequent confirmation is not received from the user in at least the three general scenarios: (1) when the user hits ESC or mouses away from the font command within the menu or toolbar option; (2) when Live Preview "times out" from the lack of user activity for a specified time; and (3) when the user previews a new font format within the same menu or toolbar option (Microsoft refers to this as "surfing").

Ex. 14 (see also ¶ 633 for Excel)

# Corel's Expert Admits There Is No "Confirming" for the First Two Scenarios

Q. Your first scenario is when the user hits escape or a mouse is away from the font command; right?
A. That's right.
**Q. This would be a scenario where the user has not confirmed the command. True?**
**A. That's right.**

Q. So going back to Paragraph 477, you also referred to a scenario where the live preview times out. Do you see that?
A. I do.
Q. And **that would be another scenario where the user does not confirm the command. True?**
**A. That's right.**

Ex. 13 at 71:9-15, 73:14-21

WHITE & CASE

44

# Corel's Third Scenario Does Not Push and Remove the Same Font Command Code

pushing the font command code corresponding to the identified font to the undo stack when a subsequent confirmation is received from the user; and

removing the font command code corresponding to the identified font from the memory medium when subsequent confirmation is not received from the user or when another font command code is identified.

> 480.  As another example, after Live Preview of the font face Arial Black is invoked
>
> and then Live Preview of a second font face is subsequently invoked, the user's document is
>
> displayed with the new previewed font face and not the Arial Black font, consistent with the
>
> Arial Black font command code being removed from the memory medium.

Ex. 14

# Two Flaws in Corel's Argument

Microsoft's motion for summary judgment of non-infringement of claim 1 depends on the fundamental flaw that the accused products both push *and* remove the same font command code in one process. Microsoft is wrong: the push and remove steps of claim 1 are conditional and mutually exclusive based on their plain language. One occurs if a user confirms a previewed format, the other occurs if a user does not or previews another format.

Dkt. 404 (Corel Opp.)

1. No precedential case allows for ignoring a method step

2. Regardless, Corel could have accused scenarios with both "pushing" and "removing"

WHITE & CASE

46

# The Limitations are Not Always Mutually Exclusive

Example:

☐ Step 1: Preview Arial

☐ Step 2: Preview Times New Roman ("removing" Arial, according to Corel)

☐ Step 3: Preview Arial again

☐ Step 4: Choose Arial ("pushing" Arial, according to Corel)

> pushing the font command code corresponding to the identified font to the undo stack when a subsequent confirmation is received from the user; and
> removing the font command code corresponding to the identified font from the memory medium when subsequent confirmation is not received from the user or when another font command code is identified.

WHITE & CASE

47

# Microsoft's Motions

- Invalidity (Obviousness)

- Non-Infringement

  - Claim 1 and Dependent Claims

  - Accused Excel Products

- Pre-suit Damages

- Damages for Foreign Sales

- Quasi-Estoppel

WHITE & CASE

# The "Font Command Code" Limitations

**1.** A method of providing a real time preview of changes to fonts in a computer system operating a document editing program having a document display window, comprising:
  storing an active document in a memory medium;
  displaying at least part of the active document in the document display window including text having an associated font command code, the document display window for editing the active document therein;
  tracking a cursor position controlled by a user in the document editing program;
  identifying a font by hovering of the cursor for a predetermined period of time over the font displayed in a menu or toolbar option of the document display window, the menu or toolbar option providing one or more available fonts, each of the available fonts associated with a respective font command codes that can be applied to the active document;

  inserting the font command code corresponding to the identified font into the memory medium storing the active document and
  updating the display of the active document in the document display windows to show the impact of the inserted font command code on the display of the text of the active document, without confirmation being received from the user;
  pushing the font command code corresponding to the identified font to the undo stack when a subsequent confirmation is received from the user; and
  removing the font command code corresponding to the identified font from the memory medium when subsequent confirmation is not received from the user or when another font command code is identified.

# Corel's Expert Says the Font Command Code is Stored in an XF/XFE Structure

555.    Under the hood, Microsoft Excel font command codes for cells may be stored in the XF or XFE identified by the particular IXFE associated with the cell. *See* Sections IX.A.4.a-b (Microsoft Excel Internal Document Model and Font Formatting). Microsoft Excel font

Ex. 14

☐ This raises a question: what in the XF/XFE data structure is the "font command code?"

# Dr. Bederson's Evasive Testimony

Q. Okay. **What is the font command code in Excel?** …
THE WITNESS: …so the underlying data structures that support those changes are – include font command codes, and I've identified specifically, for example, in Paragraph 578 **the XF and XFE data structures as supporting the font command codes**. Those are further described in the earlier section of my report that I mentioned including, for example, starting at Paragraph 219.

Ex. 16 at 83:4-91:3

# Dr. Bederson's Evasive Testimony

Q. **Is an XF itself a font command code**, in your opinion?
A. Well, as I explained in Paragraph 552, **XF is a data structure that stores a font command code**. …
Q. Right. And you show at the top of Page 55 a representation of what is stored in the XF structure; right?
A. I do.
Q. **Which of those is the font command code?** …
THE WITNESS: So I've already explained my opinion and my analysis of Excel, and I've explained that **the XF structure contains the font command code**. …

Ex. 16 at 83:4-91:3

# Dr. Bederson's Evasive Testimony

Q. So does that mean your opinion is that IFMT is a font command code? "Yes" or "no"? …

THE WITNESS: I'm not sure what else I can tell you other than giving my opinion about what the font command code in Excel is.

**Q. Can you tell me, "yes" or "no," whether IFMT is a font command code? …**

**THE WITNESS: What I can tell you is that it is part of the XF structure which contains the font command code.**

WHITE & CASE

Ex. 16 at 83:4-91:3

# For Some Limitations Dr. Bederson Identifies IXFE as a Font Command Code

g.  inserting the font command code corresponding to the identified font into the memory medium storing the active document and

588.    Microsoft Excel 2013 performs "inserting the font command code corresponding to the identified font into the memory medium storing the active document" as recited in claim 1.

589.    Microsoft Excel 2013 inserts the font command code corresponding to the identified font into the memory medium storing the active document by modifying the IXFE of a cell in the case of cell formatting and by extracting formatting data from the Etxp3 object to apply to text runs by changing the stored ifnt for the text run in the case of text box or other graphic object formatting. *See* Section IX.A.4.b. In both cases, the font command codes are stored in the same memory medium (i.e., RAM) in which the active document is stored. A more

# Microsoft's Motions

☐ Invalidity (Obviousness)

☐ Non-Infringement

– Claim 1 and Dependent Claims

– Accused Excel Products

☐ Pre-suit Damages

☐ Damages for Foreign Sales

☐ Quasi-Estoppel

WHITE & CASE

# Corel Bears Burden to Prove Marking

☐ "The burden of proving compliance with marking is and at all times remains on the patentee." *Arctic Cat Inc. v. Bombardier Rec. Prods.*, 876 F.3d 1350, 1367 (Fed. Cir. 2017).

☐ "[O]nce marking has begun, it must be substantially consistent and continuous." *Am. Med. Sys. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1537 (Fed. Cir. 1993).

☐ "In the event of failure so to mark, no damages shall be recovered . . . except on proof that the infringer was notified of the infringement . . ." § 287(a).

WHITE & CASE

58

# Corel Bears Burden to Prove Marking

☐ No dispute Corel contends its products practice the '483 patent (D.I. 387 at 6; D.I. 404 at 7)

> 62.    The inventions claimed in the Corel patents were first incorporated into
>
> WordPerfect products by at least 2000, and have remained in WordPerfect products since then.

Compl. ¶ 62 (D.I. 2)

☐ No dispute Corel did not give Microsoft actual notice of infringement until filing its complaint (D.I. 387 at 6; D.I. 404 at 6-7).

# Relevant Dates for Marking

| Date | Event |
|---|---|
| 2000 | Corel alleges WordPerfect products incorporated patented invention (D.I. 2 ¶ 62) |
| Nov. 2, 2010 | '483 patent issued |
| Sept. 16, 2011 | Virtual marking first allowed (AIA) |
| 2012 | Corel released CorelDraw and WordPerfect X6 (Exs. 28, 29) with no marking |
| Sept. 2013 | Corel alleges it began virtually marking certain products (D.I. 404 at 2) |
| July 27, 2015 | Complaint filed (D.I. 2) |

WHITE & CASE

60

# *Before* Sept. 2013 – No '483 Marking

☐ Corel does not assert marking prior to September 2013: "<u>from September 2013 through the filing of this lawsuit</u>, Corel Corporation marked all of its patent-practicing products with the '483 patent." (D.I. 404 at 2).

☐ Corel product boxes for X6 versions were not marked (Exs. 25, 26)

☐ <u>At minimum</u>, there can be no damages from Nov. 2, 2010 to Sept. 2013

**WHITE & CASE**

61

# *After* Sept. 2013 – No Proof of Consistent, Continuous Marking

☐ Physical marking:

– No dispute Corel sold unmarked X6 products after Sept. 2013 (Exs. 32, 33)

– No evidence Corel stopped selling X6 products, or modified the products or their packaging

☐ Virtual marking:

– Statute requires "an address of a posting on the Internet, accessible to the public without charge for accessing the address." § 287(a).

– Corel's sole documentary evidence of its marking website is from 2016 (Ex. 90)

– No evidence any URL for this website was added to X6 packages before July 2015

WHITE & CASE

62

# *After* Sept. 2013 – No Proof of Consistent, Continuous Marking

☐ Corel's cases about marking percentages say a "rule of reason" applies when <u>third parties</u> must mark:

– "When the failure to mark is caused by someone other than the patentee, the court may consider whether the patentee made reasonable efforts to ensure compliance with the marking requirements." *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996).

– "[W]hen others than the patentee are involved in sales to the public, a 'rule of reason' is applied . . . ." *Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1374 (Fed. Cir. 2010).

☐ Corel does not allege that third-party licensees sold X6 products

– X6 products were sold by Corel Corp. starting in 2012, before the '483 patent was transferred

WHITE & CASE

63

# Microsoft's Motions

- ☐ Invalidity (Obviousness)
- ☐ Non-Infringement
  - – Claim 1 and Dependent Claims
  - – Accused Excel Products
- ☐ Pre-suit Damages
- ☐ Damages for Foreign Sales
- ☐ Quasi-Estoppel

# Damages for Foreign Sales Require Proof of Causation

□ "If the patentee seeks to increase that amount by pointing to foreign conduct that is not itself infringing, the patentee must, at the least, show why that foreign conduct increases the value of the domestic infringement itself . . . ." *Brumfield v. IBG LLC*, 97 F.4th 854, 877 (Fed. Cir. 2024).

□ "We have recognized that 'proximate' causation is required and that proximate causation requires but-for causation plus more, including the absence of remoteness."  *Id*.

□ Software development in the U.S. "standing alone, is insufficient for foreign-sales damages before and after *Brumfield*."  *Synopsys, Inc. v. Siemens Indus.*, 2024 WL 1683637, at *14 (N.D. Cal. Apr. 17, 2024).

# Damages for Foreign Sales Require Proof of Causation

☐ For direct infringement in the U.S., Corel accuses testing and development (method claims) and sales and use of hardware (claim 14).  Ex. 86 (Bederson Rep.) ¶¶ 673-75 (D.I. 404-48).

☐ Mr. Weinstein treats foreign sales the same as U.S. sales

☐ All 3 Weinstein models address only value of U.S. product sales

☐ Corel does not address how foreign activity increased value of domestic infringement: "[T]he infringement increased the value of those accused products sold around the world" (D.I. 404 at 7)

☐ Warrants summary judgment on foreign sales and exclusion of Mr. Weinstein's corresponding opinion

WHITE & CASE

68

# Corel Offers No Proof of Causation

☐ Corel did not attempt to value Microsoft's U.S. activity, let alone how foreign usage impacted that value

> Q.  And so what would Microsoft's practice and use be?
>
> A.  Well, Microsoft's practice and use would be testing of the product that Microsoft did on its own.
>
> Q.  Did you do anything to assess the volume of      14:08:48 testing that Microsoft performed in the US?
>
> A.  No.  And I should add it would not only be testing but its own use of its product, if that wasn't obvious.
>
> Q.  Meaning Microsoft's internal use of the product?      14:09:09
>
> A.  Sure.
>
> Q.  Did you do anything to assess the volume of Microsoft's internal use of its product?
>
> A.  No.

Ex. 20 (Weinstein Depo.) at 132:11-24 (D.I. 387-8)

# Corel Offers No Proof of Causation

b. *Geographic Scope of Patent Coverage*

193. The hypothetical negotiation between Corel Corporation and Microsoft would focus only on products made, used, or sold in the United States. Under *WesternGeco* and *Brumfield*, the negotiation would also include sales of infringing products abroad flowing from acts of infringement in the United States.[324] Thus, I include two sets of infringing licenses in my conclusions: U.S. and Puerto Rico licenses only, and worldwide licenses.

Ex. 17 (Weinstein Rep.) ¶ 193 (D.I. 385-17)

# Corel Offers No Proof of Causation

221.    As discussed above, and as explained by Dr. Bederson, Microsoft developed Live Preview functionality for font formatting to increase demand for products incorporating that functionality. Further, Microsoft promoted Live Preview functionality for font formatting in its marketing messaging for those products.[339]

222.    Accordingly, Microsoft would have and did foresee and expect that its use of Live Preview functionality for font formatting in the United States, for products to be shipped worldwide, would add value for products shipped worldwide in the same way that the functionality would add value for products shipped to United States customers. That is, Microsoft's worldwide sales of the infringing products that it developed in the United States increased the value of Microsoft's U.S. practice and use of the '483 claims.

223.    At the hypothetical negotiation, Microsoft would have been willing to pay for the value—to its worldwide product pricing and sales—of Microsoft's use of Live Preview functionality for font formatting in the United States during its development of products that continued to incorporate that functionality.

Ex. 17 (Weinstein Rep.) ¶¶ 221-23 (D.I. 385-17)

# Corel Offers No Proof of Causation

☐ Mr. Weinstein agrees there is generally no connection between domestic use and foreign use:

| 16 | Q. Yeah, if -- if -- if I, as a user, buy Microsoft |
| 17 | Office in the US and I use it in the US, does that have |
| 18 | any impact on Microsoft's sales overseas? |
| 19 | A. Other things equal, it doesn't. I mean, if |
| 20 | you're a -- an enterprise customer and you buy the          14:10:50 |
| 21 | product in the US and you like it a lot and then you |
| 22 | encourage your management to use it overseas, that could |
| 23 | have an impact. That's why I said other things equal. |
| 24 | It doesn't. |

Ex. 20 (Weinstein Depo.) at 133:16-24 (D.I. 387-8)

WHITE & CASE

72

# Microsoft's Motions

- Invalidity (Obviousness)
- Non-Infringement
  - Claim 1 and Dependent Claims
  - Accused Excel Products
- Pre-suit Damages
- Damages for Foreign Sales
- Quasi-Estoppel

WHITE & CASE

# Quasi-Estoppel Bars Corel's Damages Claims

"The purpose of the doctrine of quasi estoppel is to prevent a taxpayer, after taking a position in one year to his advantage and after correction for that year is barred, from shifting to a contrary position touching on *the same facts or transaction*."

*In re Baker Hughes Inc.*, 215 F.3d 1297, 1301 (Fed. Cir. 2000).

WHITE & CASE

75

# Corel Knew of Microsoft's Alleged Infringement in 2013

> Corel has been generally aware of many of the Accused Products in light of Corel's competition in the same marketplaces as Microsoft. ==Corel first conducted an infringement investigation by certain Accused Products in or around 2013.== The results of that actual investigation are subject to the attorney-client privilege and work product protection. As evidenced by their deposition testimony, Robert Amen and Gabe Kralik are knowledgeable about said investigation. ==As a result of said investigation, Corel anticipated litigation against Microsoft for claims of patent infringement by at least July 2013.== In conjunction with its counsel of record in this case, Corel again conducted an infringement investigation by the Accused Products as part of the preparations for filing this lawsuit. Corel's communications with counsel of record in this case related to Corel's investigation as part of the preparations for filing this

Ex. 24, p. 13

WHITE & CASE

78

# Corel's Contrary Position in this Proceeding

□ Corel seeks damages on a single patent of between $184 million and $4.6 billion.

□ Corel's damages are approximately 33 to 1,000 times greater than the value it reported to Canadian tax authorities for 170 patents.

WHITE & CASE