# EXHIBIT 2

Includes Confidential Information – Attorneys Eyes Only

WHITE & CASE

# Microsoft's *Daubert* Motion and Responses

*Corel Software LLC v. Microsoft Corp.*,
**Case No. 2:15-cv-00528-JNP-DBP**

September 9, 2025

# Microsoft's *Daubert* Motion:
# Mr. Weinstein's Damages Opinions

# (1). Office 2007 Opinion is Inadmissible

☐ No evidence Mr. Weinstein's approach is generally accepted

☐ Theory relies on a single marketing document to assign four features equal value, but admits this approach ignores other valuable features

☐ Does not apportion to determine value of Live Preview for <u>fonts</u>

☐ Does not apportion royalty base – includes value of products <u>without</u> Live Preview such as Access and OneNote

# Apportionment is Mandatory

☐ "The law requires patentees to apportion the royalty down to a reasonable estimate of the value of its claimed technology, or else establish that its patented technology drove demand for the entire product." *VirnetX, Inc. v. Cisco Sys*., 767 F.3d 1308, 1329 (Fed. Cir. 2014).

☐ Courts have excluded similar opinions from Mr. Weinstein:

– "Weinstein did not even try to link demand for the accused device to the patented feature, and failed to apportion value between the patented features and the vast number of non-patented features contained in the accused products." *Id*.

– "Weinstein has failed to apportion the royalty base down to a reasonable estimate of the value of the infringed product—an error that has barred his testimony before." *Gamon Plus, Inc. v. Campbell's Co.*, No. 15 CV 8940, 2025 U.S. Dist. LEXIS 172367, at *24 (N.D. Ill. Sept. 4, 2025).

– "Weinstein similarly counts up the ten Gartner inclusion criteria, assigns equal value to each one, . . . This is insufficient." *Good Tech. Corp. v. Mobileiron, Inc.*, No. 5:12-CV-05826-PSG, 2015 WL 4090431, at *7 (N.D. Cal. July 5, 2015).

# Mr. Weinstein Did Not Properly Apportion

> 245 The user interface consists of four key features: the Ribbon, Contextual Tabs, Galleries, and Live Preview. See: MS_COREL_00360197-294 at 217-218.
>
> As discussed above, Microsoft at times has identified fewer than four features and also more than four features associated with the user interface. See, for example MS_COREL_00229207-293 at 248 (identifying 12 features).
>
> 246 2.08 percent = ¼ × ⅓ × ¼.
>
> Alternatively, if it is assumed Live Preview is one of 12 features of the user interface, then 0.69 percent of the value of Office 2007 is attributable to Live Preview.
>
> 0.69 percent = ¼ × ⅓ × ¹⁄12.

Ex. 17 (Weinstein Rep.) p.63 (D.I. 385-21)

☐ Once he acknowledges existence of other features, Mr. Weinstein must apportion. "Whether 'viewed as valuable, important, or even essential, the patented feature must be separated." *VirnetX*, 767 F.3d at 1329.

# Mr. Weinstein Did Not Properly Apportion

```
1    Q.  Did those eight additional items have no value?
2    A.  I believe they have value, yes.
3    Q.  Did you do anything in your apportionments to
4 try to remove the value contributed by these components
5 of the UI?                          10:49:26
6    A.  Well, it wasn't necessary to, because the
7 reviewers guide identified the first four, and so I
8 relied on the reviewers guide for purposes of this
9 particular apportionment.
```

Ex. 20 (Weinstein Depo.) at 57:1-9 (D.I. 387-8)

```
8    Q.  BY MR. LAMBERSON:  Do you know how many features
9 there are in Office 2007 in total?
10   A.  I don't.  No, I don't.                  11:20:00
11   Q.  Do you think it could be in the thousands?
12      MS. TREMBLAY:  Objection.  Form.
13      THE WITNESS:  It could certainly be in the
14 hundreds.  Might be in the thousands.
15   Q.  BY MR. LAMBERSON:  Do you know how many new
16 features were added in Office 2007 in total?
17   A.  I don't.
```

Ex. 20 at 68:8-17

☐  Mr. Weinstein's ¼ apportionment does not account for any other valuable features

WHITE & CASE

# Mr. Weinstein Did Not Properly Apportion

☐ Mr. Weinstein assumes font previews provide "all" the value for Live Preview:

| | |
|---|---|
| 18 | Q. And would the same be true in Exhibit 10 for |
| 19 | line 3, that you attribute all the value of Live Preview |
| 20 | to the font preview functionality?                09:09:04 |
| 21 | A. Yes, sir. |

Ex. 20 (Weinstein Depo.) at 16:18-21 (D.I. 387-8)

☐ But Corel previously asserted the '996 patent against <u>non-font</u> Live Preview features (*see* D.I. 361 at 11), so those must have value, too

# Mr. Weinstein Did Not Properly Apportion

☐ Mr. Weinstein could not say whether fonts drive demand for Live Preview:

> 25    Q.  Do you think that font previews are the basis
> 1  for customer demand for Live Preview?
> 2    A.  They certainly are important.  They're an
> 3  important factor, yes.
> 4    Q.  But do you believe they are the reason people
> 5  demand Live Preview?                              09:04:57
> 6    A.  They contribute to the reason that people want
> 7  Live Preview.

Ex. 20 (Weinstein Depo.) at 13:25-14:7 (D.I. 387-8)

☐ Even if they did, that would not avoid the need to apportion.  *See VirnetX*, 767 F.3d at 1329.

# Mr. Weinstein Did Not Properly Apportion

☐ Mr. Weinstein also failed to apportion out the value of non-infringing font previews:

Q. Microsoft Excel includes a font preview functionality that's not accused of infringing; right?

A. I think that's right.

Q. Did you attempt to determine the value of in-cell previewing in Excel?

A. No.

Q. But the in-cell preview is a font preview; right?

A. That's my understanding.

Q. Were you aware that a user could do Live Previews for fonts using the arrows keys on their keyboard?

A. Actually, I don't think I thought about that.

Q. So fair to say you didn't do anything to try to value that scenario?

A. I did not.                                09:07:25

Q. Were you aware that a user can do a Live Preview in Office while holding down the left mouse button?

A. Yes, I think so.

Q. Do you know whether that's accused of infringing?                                09:07:45

A. Not specifically, no.

Q. Did you do anything to attempt to value that use of Live Preview for fonts?

A. I did not.

Ex. 20 (Weinstein Depo.) at 14:21-16:4 (D.I. 387-8)

# Mr. Weinstein Did Not Properly Apportion

☐ Mr. Weinstein's royalty base is an average of prices for 4 Office versions

☐ 3 of those versions are more expensive because they include additional programs like Access and OneNote that do NOT have Live Preview

☐ Mr. Weinstein did NOT apportion to remove the value added by these unaccused products:

| |
|---|
| 22    Q. And Microsoft Access doesn't have Live Preview |
| 23  in it; true? |
| 24    A. I think that's right. |
| 25    Q. Do any of your apportionment factors 1 through 3 |
| |
| 1  deal with Microsoft Access? |
| 2    A. Well, they don't address Microsoft Access |
| 3  specifically, if that's your question. |

| |
|---|
| 4    Q. The Microsoft Office Professional also adds |
| 5  OneNote; right?                                        11:24:35 |
| 6    A. Yes. |
| 7    Q. OneNote doesn't have Live Preview; right? |
| 8    A. Correct. |
| 9    Q. Do any of your apportionment factors 1 through 3 |
| 10  deal with the value of OneNote?                    11:24:47 |
| 11    A. Not specifically. |

Ex. 20 (Weinstein Depo.) at 70:17-71:11 (D.I. 387-8)

# (2). Forrester Opinion is Inadmissible

- No evidence Mr. Weinstein's approach is generally accepted

- Theory relies on a single document that examined value a <u>hypothetical customer</u> (not Microsoft) would achieve by upgrading from Office 2007 to Office 2010

- Does not apportion to determine value of accused previews for <u>fonts</u>

- Does not apportion royalty base – includes value of products <u>without</u> accused previews such as Access and OneNote

# Mr. Weinstein Did Not Use Upgrade Prices as his Royalty Base

```
23    Q.  You applied the benefit percentage that you
24  calculated using the Forrester study to the average sale
25  price of Microsoft Office 2010 Professional and          12:08:35
1   Professional Plus; is that right?
2     A.  Yes.
3     Q.  That was not an upgrade price; true?
4     A.  True.
```

```
11    Q.  BY MR. LAMBERSON:  So the price of Office 2010
12  would include -- would reflect the value of all of the
13  benefits in Office 2010; right?
14    A.  Correct.
15    Q.  Not just the value of features that were new in    12:12:47
16  2010; true?
17    A.  That's true.
```

- *Mr. Weinstein used average price of Office 2010, which includes all features, not just new features*

- *Office 2010 Professional includes products that are not accused, such as Access and OneNote*

- *"The choice of royalty base makes an incredible difference in each side's damages calculations, which makes the Court particularly wary of placing Weinstein's overstated figure in front of a group of laypersons." Gamon, 2025 U.S. Dist. LEXIS 172367, at \*35-36.*

Ex. 20 (Weinstein Depo.) at 93:23-95:17 (D.I. 387-8)

17

# Mr. Weinstein Did Not Use Upgrade Prices as his Royalty Base

Do you know what the benefit amount would have been using the Forrester methodology for all of the features in Office 2010?                12:16:14

A. Thank you.

No. No, I don't.

Ex. 20 (Weinstein Depo.) at 96:23-97:17 (D.I. 387-8)

But your apportionment percentage was applied to a price that included -- of a piece of software that included Microsoft Access; right?                12:15:20

A. That -- that's true.

Q. So you would have applied 7 percent as a share of total benefits of Live Preview to a piece of software that did not have Live Preview; true?

A. True.                12:15:38

# Mr. Weinstein Did Not Use Upgrade Prices as his Royalty Base

8    Q. BY MR. LAMBERSON:  Do you know how many features
9  there are in Office 2007 in total?
10    A. I don't.  No, I don't.            11:20:00
11    Q. Do you think it could be in the thousands?
12      MS. TREMBLAY:  Objection.  Form.
13      THE WITNESS:  It could certainly be in the
14  hundreds.  Might be in the thousands.
15    Q. BY MR. LAMBERSON:  Do you know how many new
16  features were added in Office 2007 in total?
17    A. I don't.

Ex. 20 (Weinstein Depo.)
at 68:8-17 (D.I. 387-8)

19    Q. And you didn't attempt to determine that amount;
20  is that fair?                  12:16:28
21    A. Well, that's true, other than, as I said
22  previously, the $123.77 price reflects the value of the
23  product with all of its features.
24    Q. And, in fact, multiple products.  Fair?
25    A. Fair.                    12:16:49

Ex. 20 at 97:19-25

22    Q. Do you know how many feature -- how many new
23  features were added to Office 2010?
24    A. I don't.

Ex. 20 at 88:22-24

WHITE & CASE

19

# (3). Lucent Model is Inadmissible

- Lucent patent relates to form entry, which has nothing to do with previewing – it is <u>not comparable</u>

- Lucent settlement compensated for <u>interest</u>, which Mr. Weinstein did not account for in his calculations

- Mr. Weinstein does not properly <u>apportion</u> – he increased his royalty rate based on customer usage of unaccused features

# The Lucent Patent is Not Comparable to Live Preview

U.S. Patent No. 4,763,356: form entry



*Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1311 (Fed. Cir. 2009)

# The Lucent Patent is Not Comparable to Live Preview

☐ Corel's experts agree the Lucent patent relates to data entry, not previewing:

| | |
|---|---|
| 17  Q. The Lucent patent relates to data entry; true? | 10  Q. Is this providing any kind of preview?    17:21:38 |
| 18  A. Yes, that's correct. | 11  MR. LINDEN: Objection. Vague.    17:21:45 |
| 19  Q. Data entry is not the same as previewing; true? | 12  (The witness reviewed material.)    17:23:36 |
| 20  A. I agree.                    13:08:17 | 13  THE WITNESS: Looking at Figure 4, the window    17:23:39 |
| 21  Q. Do you recall whether the Lucent patent mentions | 14  that lets a user enter a year looks to be like a data    17:23:42 |
| 22  previewing anywhere in it? | 15  entry box. So I don't think that a person of skill in    17:23:49 |
| 23  A. I don't. | 16  the art would primarily consider that to be a preview.    17:23:54 |

Ex. 20 (Weinstein Depo). at 102:17-23 (D.I. 387-8)        Ex. 16 (Bederson Depo.) at 146:14-147:16 (D.I. 387-4)

# Lucent Obtained Damages <u>and</u> Interest

> 22  of stand-alone Outlook that were included in Lucent's damages calculation.  The Court
> 23  determines that a lump-sum reasonable royalty of $26.3 million is the highest damages award
> 24  that is supported by substantial evidence, and that this award reflects a proper apportionment
> 25  as required by law.  See Uniloc, 632 F.3d at 1318.[12]

Ex. 23 (MS_COREL_00541503) (385-23)

> 6      (4) The Court previously awarded Lucent pre-judgment interest calculated from January
> 7  13, 2003 through December 11, 2006.  Applying that calculation to a judgment of $26.3 million
> 8  yields pre-judgment interest in the amount of $14,401,653.81.  The Court incorporates that
> 9  amount into the final judgment.

Ex. 23 (MS_COREL_00541511) (385-23)

*\* Total amount awarded by district court: $40.7 million*

# Mr. Weinstein Increased His Royalty Based on Use of Unaccused Features

213.    The average of the highest values for Word, Excel, and PowerPoint in the Table 6 above reflects an average usage rate of 77.6 percent for Live Preview for font formatting commands in these applications.[335]

214.    I understand that in the *Lucent* case, there was evidence that 43 percent of Microsoft Outlook users utilized the "date picker" feature found to infringe.[336] Therefore, Microsoft's data in this case indicate that 1.8 times as many users utilize Live Preview for font formatting commands than the number of users that utilized the "date picker" feature found to infringe in *Lucent*.[337] Microsoft's data was collected from November 2006 to January 2008, and Microsoft would have known of and considered this data in a hypothetical negotiation with Corel Corporation in November 2010. I adjust the ERR of the Lucent license ($0.41) upward by 1.8 times, to $0.74, to account for the difference in usage of the features at issue in the Lucent license and the hypothetical license.

---

5    Q. And you used the usage percentages for the font    13:16:32

6 size combo to determine what you called the average usage

7 rate for Live Preview for font formatting commands; is

8 that right?

9    A. That's correct.

10    Q. But this table doesn't show percentage usage of    13:16:49

11 Live Preview; isn't that correct?

12       MS. TREMBLAY: Objection. Form.

13       THE WITNESS: It shows -- it shows percentage

14 use of the formatting commands.

15    Q. BY MR. LAMBERSON: And somebody can change the

16 font size in Word, for example, without getting a

17 preview; true?

18    A. I agree.

Ex. 17 (Weinstein Rep.) ¶¶ 213-14 (D.I. 385-17)      Ex. 20 (Weinstein Depo.) at 107:5-108:1 (D.I. 387-8)

WHITE & CASE

26

# Corel's *Daubert* Motion:
# Mr. Hansen Damages Opinions

# Mr. Hansen's Opinions Address Factor 12

▫ "12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions."  *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

▫ Factor 12 is not limited to executed licenses

– Factor 1 covers: "The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty."

▫ Mr. Hansen accounted for differences between valuations

– "These valuations are before other necessary downward adjustments to reflect the more limited scope of rights in the hypothetical negotiation of just the '483 patent (i.e., not additional Corel patents) and license rights instead of ownership rights."  Ex. 1 (Hansen Rep.) ¶ 207 (D.I. 381-1).

▫ No basis for excluding all other rebuttal opinions (such as Intel offers)

WHITE & CASE

28

# Courts Approve Use of Valuations Besides Executed Licenses

☐ "[T]he district court heard evidence that, around the time of the hypothetical negotiations, the parties themselves had brief discussions regarding Cisco taking a license to the '069 patent." *Commonwealth Sci. & Indus. Research Org. v. Cisco Sys.*, 809 F.3d 1295, 1302-03 (Fed. Cir. 2015).

☐ "The use of offered rates is acceptable if properly considered." *Solas OLED Ltd. v. Samsung Elecs. Co.*, 2022 U.S. Dist. LEXIS 100434, *5 (E.D. Tex. May 30, 2022).

☐ Plaintiff's "estimation of its own worth at or near the time of the hypothetical negotiation" a permissible valuation for the jury to assess. *Robocast, Inc. v. Microsoft Corp.*, 2014 U.S. Dist. LEXIS 5836, *6 & n.3 (D. Del. Jan. 16, 2024).

Confidential Information – Attorneys Eyes Only

# McGladrey Opinions are Admissible

- Mr. Hansen compared McGladrey and a hypothetical negotiation:

- "The value of a license to the patent-in-suit would represent only a fraction of the total ownership value for all 171 patents."  Ex. 1 (Hansen Rep.) ¶ 183.

- "[T]he McGladrey Valuation includes far more rights than Microsoft would receive from Corel in the hypothetical negotiation (i.e., a license to practice the patent-in-suit in the United States)."  *Id.* ¶ 184.

- "[T]he parties to the hypothetical negotiation would expect Corel Software to attempt to earn a reasonable return from licensing the transferred patents . . . ."  *Id.* ¶ 186.

# Corel's *Daubert* Motion:
# Dr. Olsen's Technical Opinions

# Experts Can Discuss Plain and Ordinary Meaning

"parties may introduce evidence as to the plain and ordinary meaning of terms not construed by the Court to one skilled in the art, so long as the evidence does not amount to arguing claim construction to the jury."
*Huawei Techs. Co. v. Samsung Elecs. Co*., 340 F.Supp.3d 934, 949 (N.D. Cal. 2018)

# Both Experts Explain What Font Command Codes Are Without Redefining the Term

| Olsen Report (Ex. 1) | Bederson Report (Ex. 86) | Bederson Dep. (Ex. 31) |
|---|---|---|
| 53. At the time of the '483 patent, a POSITA would generally have considered a command code to be a small **data item**, such as an integer or a string, that would indicate a choice of action to be taken. In the case of "fonts," a "font command code" would be the data item **that indicates, for example, which specific font face (e.g., Arial Black), font size (e.g., 12 point), or font color (e.g., black) should be applied to the text of the document**. | 352. As I indicated in my prior Declarations, a POSITA would understand that a "font" refers to a **set of attributes** for text characters.  Accordingly, each of the Accused Live Preview Font Commands would comprise a "font" because they change an **aspect of text like font face, font size, font color, or highlighting**. | "I think a font command code could be a **data element** that's part of a data structure." |

WHITE & CASE

40

# Both Experts Explain What Font Command Codes Are Without Redefining the Term

| Challenged Olsen Opinion (Ex. 1) | Bederson Opinion (Ex. 86) |
|---|---|
| 54. The '483 patent confirms it is adopting this well-understood meaning of "font command code." It says, "[i]t is **not the intent of the invention to alter how codes are stored in a document**. The invention may be implemented in existing application programs by using the existing subroutines to insert code, identify matching codes and replace them" ['483 patent at 7:52-56]. | 734. In fact, the patent specification explains how in the context of the invention, the method of implementing font formatting is not of critical importance. See '483 Patent at 7:43-51 ("It is **not the intent of the invention to alter how codes are stored in a document**. The invention may be implemented in existing application programs by using the existing subroutines to insert code, identify matching codes and replace them. …") |

WHITE & CASE

41

# Explaining Technical Concepts is Not Improper Claim Construction

| Challenged Olsen Opinion (Ex. 1) | Bederson Opinion (Ex. 86) |
|---|---|
| 56. The '483 patent describes a preferred embodiment called "**matching codes**." … ['483 patent at 7:24-42]. | 725. The specification further refers to the use of **matching codes** to specify formatting effects to be applied to a block of text.  See '483 patent at 7:24-42. |

# Explaining Technical Concepts is Not Improper Claim Construction

59.    A POSITA would have understood that a "font command code" is different from a "font command."  For example, the patent says, "application programs do not generally have a discrete mapping between **commands** and **code** to be inserted into the document.  Rather a command will invoke a **software subroutine** that performs numerous tests and checks, and may ultimately result in **code** being added to the active document.  … The implementation of such routine would be well known to one skilled in the art" ['483 patent at 7:43-51].  Here, the '483 patent distinguishes between a command, the software subroutines that implement the command, and the code inserted into the active document by the subroutines.

Ex. 1

# Explaining Technical Concepts is Not Improper Claim Construction

64.    The undo implementation Corel describes in its patent is relatively simple and straightforward.  As discussed above, Corel's patent describes inserting font command codes into the user's active document, similar to how Reveal Codes worked in WordPerfect.  So for example, if a user changed the font face in their document to Arial, this could result in a font command code "Font: Arial" being inserted into the document.  Corel's system would then place the "Font: Arial" command code onto the undo stack.  To perform an undo operation, Corel's patented system would look at its undo stack, see that "Font: Arial" was the most recent command code added to the document, then go into the document and remove that font command code from the document.  The removal of that command code would undo the font change.

**WHITE & CASE**

Ex. 1

# Corel's Expert Agrees WordPerfect Codes Are Font Command Codes

| each of the available fonts associated with a respective font command codes that can be applied to the active document; | Each of the available fonts provided by WordPerfect 9 in the menu or toolbar option is associated with a respective font command code that can be applied to the active document. The inventors of the '483 patent explained that WordPerfect 9 uses codes corresponding to font commands for Real Time Preview. Woodward Dep. 14-16, 21-22; Unbedacht Dep. 114-117, 144-145. |
|---|---|

Ex. 86, p.514

# The File History Can Help the Jury Understand Non-Infringement Issues

"Apple's support for its argument, **including references to the prosecution history** of the Asserted Patents, **helped the jury to apply the plain and ordinary meaning** of 'node' to the accused devices, and thus was proper.  *See, e.g., Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1552 (Fed. Cir. 1989) (affirming jury verdict of noninfringement as '[t]he jury had before it the prosecution history and testimony directed to' the absence of claim limitations in accused products)."

*GPNE Corp. v. Apple Inc.*, 108 F. Supp. 3d 839, 857 (N.D. Cal. 2015)

# The File History Can Help the Jury Understand Non-Infringement Issues

> 204.    Dr. Bederson appears to believe (at ¶ 440) that it is sufficient that the scratch document resides in the same RAM as the original document. I disagree. The limitation says the "font command code corresponding to the identified font" is stored in "the memory medium storing the active document." This limitation thus refers to the portion of the memory medium storing the active document, not the portion of the memory medium storing another document that is not the active document. This is consistent with the '483 patent specification, which says it "executes the identified command on the entire active document when it is identified" ['483 Patent at 3:30-32]. It is also consistent with the prosecution history of the '483 patent, where Corel said its preview happens in the document itself, rather than a separate "sample portion" [COREL0000142]. The "sample portion" Corel referred to in the prior art would be in the same memory as the document, but Corel said that was different from its invention.

# Dr. Olsen's Opinion is Consistent With the Court's Summary Judgment Order

The structure of the '483 patent confirms this interpretation. The elements of Claim 1 include: 1) "storing an active document," 2) "displaying at least part of the active document," 3) "identifying a font by hovering the cursor for a predetermined period of time over the font displayed in a menu or toolbar option . . . associated with a respective font command codes that can be applied to the active document," 4) "inserting the font command code corresponding to the identified font into the memory medium storing the active document," and 5) "updating the display of the active document in the document display windows to show the impact of the inserted font command code." These elements show that the active document is the same core document that is stored and displayed before a font is selected and previewed by updating the display of the active document in the display window. Under the '483 patent, the same active document is used for the entire process. But the scratch document method creates a new temporary document to display

Dkt. 361 (2/12/2024 Claim Construction Order)

# Analyzing the File History is Necessary for a Doctrine of Equivalents Analysis

"A **necessary part** of the function/way/result equivalency analysis is the function of the substituted element as seen in the context of the patent, **the prosecution history**, and the prior art."

*Zenith Labs., Inc. v. Bristol-Myers Squibb Co*., 19 F.3d 1418, 1425 (Fed. Cir. 1994)

# Analyzing the File History is Necessary for a Doctrine of Equivalents Analysis

The available scope of protection of a patent under the doctrine of equivalents is not, however, limited solely by prosecution history estoppel … **[T]hrough statements made during prosecution of a patent application, it can become evident that an asserted equivalent is beyond coverage under the doctrine of equivalents**."

*Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 141 F.3d 1084, 1090 (Fed. Cir. 1998)

# Analyzing the File History is Necessary for a Doctrine of Equivalents Analysis

¶¶ 725, 734; it is entirely appropriate, as Dr. Bederson does, to use the written description to analyze the function of a claim term as well as insubstantial differences between the claim element and the accused product. *See AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320,

Corel Reply at 2

# Example Opinion

318.    Dr. Bederson says (at ¶¶ 750-753) the "way" Excel and PowerPoint inserts font formatting is the same as the patent, but these programs (like Word) also create a clone and apply the change to that clone, which as noted is substantially different.  In fact, both these products only copy a portion of the original document, which is significantly different from the patent.  Corel was clear that its patent makes the change "on the document or application itself, rather than on a sample portion" [COREL0000142].  Excel and PowerPoint use a "sample portion" approach, which Corel itself said is a different way of operation.

Ex. 1

# A Doctrine of Equivalents Analysis Also Requires Analyzing the Prior Art

"A **necessary part** of the function/way/result equivalency analysis is the function of the substituted element as seen in the context of the patent, the prosecution history, **and the prior art**."

*Zenith Labs., Inc. v. Bristol-Myers Squibb Co*., 19 F.3d 1418, 1425 (Fed. Cir. 1994)

# Example Opinion

352.     Finally, Dr. Bederson writes (at ¶ 866) that the undo approach in the '483 patent and the accused products are "interchangeable." This is clearly wrong. Each uses an entirely different approach to "undo"—an approach driven by the unique architecture for that piece of software. Word uses an "undo" document and character positions because in Word it is easy to make a new document to store temporary information. Excel copies IXFE values because that is how Excel indexes font formatting information. WordPerfect used font command codes because its architecture was built around the use of codes. One could not take the Word undo stack and put it in Excel or WordPerfect—it would not work. None of the approaches are "interchangeable" with one another. Dr. Bederson notes that these approaches for performing "undo" were all well-known and obvious, and I agree. But that is not evidence that they are "interchangeable," since each is unique and different.

# Corel's Expert Also Examined Interchangeability of The Two Products

737.    As another example, an Accused Product, Microsoft Word, is capable of opening WordPerfect documents (a system that according to Microsoft expects special formatting characters in the text stream) and vice versa. The interchangeability of document types using the two approaches is further evidence that the Accused Products use an equivalent of the claimed "font command code."

# Mr. Little's Graphic is Not New Evidence





56

# Mr. Little's Graphic is Not New Evidence

The "scratch document" method of previewing font command codes, employed by each of the Microsoft MSJ Products, is central to Microsoft's argument. Under this method, when the user opens a font selection drop-down menu and hovers the cursor over a font selection, a pixel-for-pixel clone of the user's document—the scratch document—is generated and overlaid on top of the original document.[9] Because this scratch document is an exact copy of the original document, the user does not perceive that a clone is displayed on the screen, rather than the original document. The font selection is displayed in the scratch document that appears on the user's screen. The original document remains unchanged. The user can repeat this process to review the display of

Dkt. 361 (2/12/2024 Claim Construction Order)

WHITE & CASE

57